UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NECA-IBEW PENSION TRUST FUND and DENIS MONTGOMERY, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, KENNETH D. LEWIS, JOE L. PRICE, NEIL A. COTTY, WILLIAM BARNET, III, FRANK P. BRAMBLE, SR., JOHN T. COLLINS, GARY L. COUNTRYMAN, TOMMY R. FRANKS, CHARLES K. GIFFORD, W. STEVEN JONES, WALTER E. MASSEY, THOMAS J. MAY, PATRICIA E. MITCHELL, THOMAS M. RYAN, O. TEMPLE SLOAN, JR., MEREDITH R. SPANGLER, ROBERT L. TILLMAN, JACKIE M. WARD, BANC OF AMERICA SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MORGAN STANLEY & CO. INCORPORATED, UBS SECURITIES LLC, WACHOVIA CAPITAL MARKETS, LLC, DEUTSCHE BANK SECURITIES, J.P. MORGAN SECURITIES INC.,<br><br>Defendants. | Case No. 10-cv-00440 (LAK) (HBP)<br><br><u>CLASS ACTION</u><br><br>ECF CASE |


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
UNDERWRITER DEFENDANTS' MOTION TO DISMISS COUNTS I AND II
OF THE FIRST AMENDED COMPLAINT**

## TABLES OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.      The First Amended Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

            1.      The Mortgage/Financial Market Crisis. . . . . . . . . . . . . . . . . . . . . . . . . 3

            2.      BofA's Failure to Accurately Disclose Results of Operations and its
                   Capital Base. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

            3.      Inaccurate CDO and HEL Accounting Resulted in False Reporting of
                   BofA's Capital Base at the Time of the Offerings. . . . . . . . . . . . . . . . 5

            4.      The Countrywide Acquisition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

      I.      PLAINTIFFS SATISFY §12(a)(2) STANDING REQUIREMENTS. . . . . . . . 10

      II.      PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED. . . . . . . . . . . . . . . . . . . 12

      III.      THE FAC ALLEGES ACTIONABLE MISSTATEMENTS AND OMISSIONS
            IN THE OFFERING DOCUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## TABLES OF AUTHORITIES

## CASES

Page

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Barclays Bank PLC Sec. Litig.,*
    No. 09-cv-1989, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) . . . . . . . . . . . . . . . .10,12,14,15

*Beauchamp v. Financial Recovery Services, Inc.,*
    No. 10-cv-4864, 2011 WL 891320 (S.D.N.Y. March 14, 2011) . . . . . . . . . . . . . . . . . . . . 9

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Caiafa v. Sea Containers Ltd.,*
    331 Fed. Appx. 14 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*City of Pontiac Gen. Emps., Ret. Sys, v. MBIA, Inc.,*
    No. 09-cv-4609, 2011 WL 677404 (2d Cir. Feb. 28, 2011). . . . . . . . . . . . . . . . . . . . . . 13

*In re Century Aluminum Co. Sec. Litig.,*
    749 F. Supp. 2d 964 (N.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Erickson v. Pardus,*
    551 U.S. 89 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fiat v. Regions Financial Corp.,*
    712 F. Supp. 2d 117 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Freidus v. ING Groep N.V.,*
    736 F. Supp. 816 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15

*In re IndyMac Mortg.-Backed Sec. Litig.,*
    718 F. Supp. 2d 495 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Initial Pub. Offering Sec. Litig.,*
    358 F. Supp. 2d 189 (S.D.N.Y 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*In re Lehman Bros. Sec. & ERISA Litig.,*
    No. 09-md-02017, 2011 WL 1453790 (S.D.N.Y. Apr. 13, 2011) . . . . . . . . . . . . . . . . . . 3

*Merck & Co., Inc. v. Reynolds,*
    130 S. Ct. 1784 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Morgan Stanley Information Fund Sec. Litig.,*
    592 F. 3d 347 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.,*
    No. 08-cv-5653, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) . . . . . . . . . . . . . . . . . . .12

*Plumbers' Union Local 12 Pension Fund v. Nomura Asset Acceptance Corp.,*
    658 F. Supp. 2d 299 (D. Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Public Employees' Retirement System of Mississippi v. Goldman Sachs Group Inc.,*
    No. 09-cv-1110, 2011 WL 135821 (S.D.N.Y. Jan. 12, 2011) . . . . . . . . . . . . . . . . . 11,13

*In re Scottish Re Group Sec. Litig.,*
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*In re Sterling Foster & Co., Inc., Sec. Litig.,*
    222 F. Supp. 2d 216 (E.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Wachovia Equity Sec. Litig.,*
    No. 08-cv-6171, 2011 WL 1344027 (S.D.N.Y. Mar. 31, 2011) . . . . . . . . . . . . . . . . . . 13

*In re WorldCom Inc., Sec. Litig.,*
    No. 02-cv-3288, 2005 WL 335201 (S.D.N.Y. Feb. 14, 2005) . . . . . . . . . . . . . . . . . . . .10

*In re WorldCom Sec. Litig.,*
    496 F. 3d 245 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*In re WorldSpace Sec. Litig.,*
    No. 07-cv-2252, 2008 WL 2856519 (S.D.N.Y. July 21, 2008) . . . . . . . . . . . . . . . . . . .9

**STATUTES**

15 U.S.C. §77k (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 10
15 U.S.C. § 77l (a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
15 U.S.C.§ 77(k)(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
Fed. R. Civ. P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

Lead Plaintiff, NECA-IBEW Pension Trust Fund ("NECA-IBEW"), respectfully submits this Opposition to the Underwriter Defendants' Motion to Dismiss Counts I and II of the First Amended Complaint (the "FAC").[1]

## PRELIMINARY STATEMENT

The Underwriter Defendants' motion does not raise new or unique arguments separate from the BAC Defendants' motion and predominantly adopts the arguments set forth therein. *See* Underwriter Defendants' Memorandum of Law in support of their motion to dismiss the FAC (hereafter, "Underwriter Mem.") at pp. 1, 3, 7-8, 11, n.5 and 6.  As such, to avoid unproductive duplication, NECA-IBEW will not repeat the detailed arguments set forth in its Memorandum of Law in Opposition to the BAC Defendants' motion to dismiss (hereafter, "Pltf's Opp. BAC Mem."), and hereby incorporates its arguments, positions and factual recitations as if set forth herein.

Like the BAC Defendants, the Underwriter Defendants seek to avoid liability for violating the 1933 Securities Act by arguing that Bank of America's ("BofA") failure to predict the credit and financial crisis is not actionable and, ergo, BofA should not be held liable for material misrepresentations and omissions of fact at the time of the Offerings.  Similarly, Underwriter Defendants incorrectly contend that the FAC's claims are time-barred based on generalized macroeconomic events and purported cautionary disclosures that placed Plaintiffs on constructive notice during the so-called "financial crisis" (in late-2008), and that Plaintiffs lack

---

[1] The Underwriter Defendants for purposes of this Opposition are Citigroup Global Markets, Inc., Deutsche Bank Securities, J.P. Morgan Securities, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co., Inc., UBS Securities LLC, and Wachovia Capital Markets, LLC (n/k/a/ Wells Fargo Securities, LLC) (collectively, the "Underwriter Defendants").  Underwriter Defendant Bank of America Securities, LLC, is separately represented and incorporated as part of the Bank of America Defendants' ("BAC Defendants") motion to dismiss. *See* Bank of America Defendants' Memorandum of Law in support of their motion to dismiss the FAC (hereafter, "BAC Mem.") p. 1, n.1.

1

§12(a)(2) standing to assert their claims.  Lastly, Underwriter Defendants also adopt BAC Defendants' argument that Plaintiffs fail to allege any actionable misrepresentations and omissions. None of the arguments promulgated by the Underwriter Defendants are credible and do not warrant dismissal of the FAC.

As set forth in detail in NECA-IBEW's Opposition to the BAC Defendants' motion, Plaintiffs' claims are not time barred as they were put on notice of their claims no earlier than January 16, 2009 (not a generalized time period, asserted as late-2008), and plaintiff Denis Montgomery ("Montgomery"), filed this action within the one year limitations period.  Further, NECA-IBEW and Montgomery have sufficiently pled §12(a)(2) standing for the Series K and H Offerings and, lastly, the FAC alleges actionable misstatements or omissions in the Offering documents in violation of the Securities Act.

## STATEMENT OF FACTS

**A.     The First Amended Complaint**

On January 16, 2009, BofA issued a press release concerning its fourth quarter and full year 2008 financial performance which, for the first time, included the results of Countrywide Financial Corporation ("Countrywide") following BofA acquiring Countrywide on July 1, 2008 (first announced on January 11, 2008). FAC ¶¶ 15, 109.  The press release disclosed multiple billions of dollars in write downs and net-charge offs from loans, mortgages originating from Countrywide being BofA's responsibility post-acquisition that were unlikely to be repaid. The press release also drastically increased loan loss provisions losses for bank loans, collateralized debt obligations ("CDOs") and securities secured by commercial mortgages. *Id.*

In the FAC, NECA-IBEW and Montgomery seek to represent a class of purchasers of

Series K, L and H Offerings. FAC ¶¶ 1, 10-12, 58-59.[2]  On and after January 24, 2008 (the date of the Series K Offering), NECA-IBEW purchased Series K Securities directly from defendant Banc of America Securities LLC. *Id.* ¶¶ 10, 20, 42.  On May 20, 2008 (the date of the Series H Offering), plaintiff Montgomery acquired the Series H Securities directly through defendant Merrill Lynch. *Id.* ¶¶ 12, 21, 44.

       **1.**       **The Mortgage/Financial Market Crisis**

The nationwide subprime mortgage crisis was characterized by a rise in subprime mortgage delinquencies and foreclosures, and a resulting decline in the sale and/or solvency of mortgage-backed securities.  The trigger of the crisis was a significant decline in the U.S. housing market which had peaked in 2005–2006. FAC ¶¶ 60-63.  In the years leading up to 2006, the U.S. housing market prospered as mortgage loans were readily available to high credit-risk consumers through unique product design and relaxed lending standards tethered to increasingly risky terms. *Id.*  Lenders were willing to provide loans to riskier borrowers because there was "instant money" made when mortgage purchasers in the secondary market seemingly relieved the lender of the risk associated with these loans through their securitization. *Id*. Trouble in the housing and mortgage markets gained momentum throughout 2007 and foreclosures skyrocketed and loan originators filed for bankruptcy protection. The financial media publicly attributed the difficulties to lax mortgage underwriting and salacious lending practices. *Id.* ¶ 65.

During the summer of 2007, the Federal Reserve Board responded by implementing (undisclosed) emergency "credit and liquidity programs" to assist federal banks in the form of

---

[2] Because the three (3) year statute of repose for claims asserted under the Series L Securities passed without the joinder or intervention of an additional named plaintiff for this Offering, Plaintiffs concede that claims relating to the Series L Offering cannot proceed in this action. *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-md-02017, 2011 WL 1453790, *3 (S.D.N.Y. Apr. 13, 2011).

3

discounted loans, credit facilities, purchase agreements, liquidity swap arrangements and other tools to help financial institutions during the escalating crisis. FAC ¶ 66.[3] These credit and liquidity programs only recently have become transparent through the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act. *Id.*

### 2. BofA's Failure to Accurately Disclose Results of Operations and its Capital Base

BofA is a federal bank holding company subject to the supervision of the Federal Reserve Board, the OCC and the FDIC.  These regulating agencies have issued risk-based and leveraged capital guidelines, applicable to BofA, that define a multi-tiered capital framework to evaluate a financial institutions capital adequacy. FAC ¶¶ 2-3.  The guidelines are supplemented by leverage ratio requirements, calculated by dividing a bank's Tier 1 risk-based capital by its average total consolidated assets. *Id.* Effective January 1, 2007, the FDIC adopted a rating system that employed four capital categories for insured depository institutions (*i.e.*, "well capitalized," "adequately capitalized," "undercapitalized" and "significantly undercapitalized"), and implemented a new two-step categorization process principally based on a bank's tiered capital and leverage ratios. *Id.* ¶4. Under this rating system, the designation "well capitalized," required that a bank's total risk-based capital ratio be equal to or greater than 10 percent, its Tier 1 risk-based capital ratio need be equal to or greater than 6% and its Tier 1 leverage capital ratio was required to be equal to or greater than 5%. *Id.*

On October 1, 2007, BofA acquired ABN AMRO North America Holding Company, the

---

[3] It was only recently made public on March, 31, 2011 (after the filing of the FAC), that BofA had secretly utilized the non-public Federal Reserve's loan discount window to the tune of $1.5 billion on August 22-24, 2007, the exact time that BofA made its initial $2 billion investment in Countrywide. *See e.g.*, Bloomberg.com "Bank of America Kept Tapping Fed Facility After 2007 Show of Leadership" http://preview.bloomberg.com/news/2011-03-31/bofa-kept-tapping-fed-facility-after-2007-show-of-leadership-.html. (Hugh Son and Dakin Campbell, March 31, 2011).

parent of LaSalle Bank Corporation, for $21.0 billion in cash. FAC ¶ 71. As a result of this acquisition, BofA significantly depleted its reportable Tier 1 capital, reducing the Company's Tier 1 leverage ratio to just slightly above the 5% number necessary to maintain its "well capitalized" designation. *Id.* As further explained below, by the end of the fourth quarter 2007, BofA's Tier 1 leverage capital ratio had fallen below the 5% "well capitalized" threshold – a material fact that the Company did not disclose in its SEC filings. *Id.* ¶ 13.

### 3. Inaccurate CDO and HEL Accounting Resulted in False Reporting of BofA's Capital Base at the Time of the Offerings

In August 2001, BofA announced that it was exiting the subprime real estate lending businesses because it did "not fit the company's strategic and profitability objectives." FAC ¶ 5. However, BofA continued to periodically purchase subprime mortgages from third party loan originators for the purpose of pooling them with "Alt-A" loans, mid and prime residential mortgages, and other loan products (including home equity loans ("HEL")), which it then securitized as CDOs for sale to investors.[4] *Id.* ¶ 6. While BofA conducted (on average) just three such CDO offerings per year between 2002 and 2004, in 2005 the Company substantially increased its CDO underwriting production to 9 offerings, followed by 10 new CDO offerings in 2006. *Id.* By year-end 2007, BofA had increased its *net* exposure from such instruments to approximately $11.63 billion of volatile *subprime* mortgage instruments. *Id.* ¶ 7.

Additionally, since BofA's primary source of mortgages to BofA for repackaging as securitized CDO investments in 2005-2007 was Countrywide, the impact to the housing and credit markets in 2006-2007 became increasingly important to assessing the quality of BofA's mortgage-backed CDOs. FAC ¶ 8. While residential mortgages, HEL's and commercial property

---

[4] For a description of various CDO and RMBS tranches, *see* FAC ¶¶ 6-7

loan portfolios were exponentially increasing the number of nonperforming loans held by BofA, quarter-by-quarter, BofA assumed an undisciplined and improper approach in satisfying its financial reporting obligations, failing to properly mark-to-market its CDO portfolio and timely reserve for losses and write-down of assets to present value. If properly recorded, the losses and write downs would have materially altered the Company's Tier 1 ratios. *Id.*[5] As a result, BofA, at least negligently, failed to charge off (cumulatively) approximately $209 million, $262 million and $626 million of respectively, impaired residential mortgages, commercial real estate loans and HELs for the second, third and fourth quarter 2007. *Id.* ¶ 94. Had BofA properly reported its financial condition, BofA would have been stripped of its "well capitalized" rating.

On January 22, 2008, BofA reported the Company's results of operations for the fourth quarter of 2007, disclosing write downs of its high grade, mezzanine and CDO squared tranches in the Company's "Super Senior" CDOs of, respectively, $873 million, $757 million and $2.329 billion. FAC ¶ 72. The Company also stated that at year end 2007 its HEL portfolio was $144.8 billion and nonperforming HELs were $1.3 billion. *Id.* In addition, the Company reported year end 2007 Tier 1 capital and leverage ratios of 6.87% and 5.04%, respectively. *Id.* On February 28, 2008, BofA filed its Form 10-K annual report for 2007 with the SEC. *Id.* ¶ 73. BofA's 2007 10-K reported that the Company had year end risk-based capital ratios of: Tier 1 – 6.87; Total -

---

[5] By June 30, 2007, BofA held approximately $96.5 billion in HELs, representing approximately 18.9% of the Company's total amount of held consumer loans and leases while the percentage of nonperforming HELs had grown 70% over the first six months of 2007. FAC ¶ 92. By September 30, 2007, the amount of BofA originated HELs that the bank held on its books had grown to over $101 billion with nonperforming HELs mushrooming to $764 million (an increase of over 160% since the end of 2006). *Id.* Similarly, fourth quarter 2007 results of operations associated with BofA's HEL portfolio show increasing HEL defaults. *Id.* Inexplicably, BofA's HEL write-offs during 2007 remained a small fraction of the Company's actual credit loss exposure, and was significantly less than banking industry peers Citibank and J.P. Morgan. *Id.* ¶ 93. BofA's net charge offs for HELs during the first, second, third and fourth quarters 2007 (expressed as a percentage of its average HEL loan balances, on an annualized basis) was .08%, .12%, .20% and .63%, respectively which by comparison, for this same period Citibank's HEL net charge offs were .47%, .61%, .94% and 1.67%, respectively, and J.P Morgan's were, .32%, .44%, .65% and 1.05%, respectively. *Id.*

11.02%; and Tier 1 Leverage – 5.04%. *Id.* ¶ 74.

However, BofA failed to take sufficient reserves and charge-offs to its CDO and loan portfolios for the second, third and fourth quarters of 2007. The cumulative amount of this failure was at least $1.01 billion for BofA-originated loans/HELs and at least $2.2 billion for CDOs. BofA therefore, materially misstated its Tier 1 leverage ratio (publicly stating 5.04% though the actual ratio was approximately 4.85%) and, thus, misrepresented its FDIC rating as "well capitalized" at year end 2007, causing materially false and misleading financial disclosures to accompany each of the Offerings. FAC ¶ 13-14. Because the financial results were incorporated by reference into the Offering documents for the Series K and H Offerings, the Offering documentation was materially false and misleading.

### 4. The Countrywide Acquisition

On August 22, 2007, BofA announced making a $2 billion stock investment effectively in exchange for a 16% beneficial interest in Countrywide. FAC ¶ 77. Following extensive negotiation and analysis, in December 2007, BofA then began thoroughly investigating the purchase of all of Countrywide. After completing at least thirty days of "extensive due diligence" using over sixty BofA employees and outside companies, on January 11, 2008, BofA announced its definitive agreement to purchase Countrywide for approximately $4.0 billion in BofA common stock (the "CW Acquisition"). *Id.* ¶ 78.

Kenneth D. Lewis, then BofA Chairman and CEO, touted the CW Acquisition as a "once in a lifetime opportunity" for BofA to become the number one mortgage originator and mortgage servicer. FAC ¶ 78. BofA also stated that the CW Acquisition required additional capital for BofA to maintain its rating for Tier 1 capital and projected that earnings per share would not be negatively impacted for 2008 and "3% accretive in 2009." *Id.* ¶ 82.

On January 11, 2008, BofA's senior management also made the following public statements concerning the CW Acquisition and BofA's preceding due diligence analysis:

> As you are all aware, this year has been tough for them as their model was severely impacted by market liquidity concerns and the ability to fund asset growth. *These problems play into our strengths as we have the funding of our deposit book and access to the markets to continue to grow the business.* FAC ¶ 83 (emphasis added).
>
> *The good news is much of the originations in the current market are of much higher quality and better spreads than the past couple of years.* Last, the secondary markets remain fragile and worth keeping an eye but many spreads have been improving. *Ibid.* (emphasis added).
>
> [T]he due diligence on this deal was extensive. *We had more than 60 people on the ground for the better part of the last 30 days, with more focus picking up through the holidays.* The focus of the due diligence, as you would expect, was on the mortgage servicing rights, credit, and legal, as well as accounting and operational areas. *The results of our due diligence support our overall valuation and pricing of the transaction.* (emphasis added).[6]

FAC ¶ 84

On February 13, 2008, BofA affirmed the above material representations. FAC ¶ 87. As of June 8, 2008, BofA was claiming that "[w]e understood that there was a black hole from here to there and that Countrywide was going to go through some financial difficulties. The question was, how big is the hole. *We did more due diligence than we have ever done on a deal and we concluded that the hole was manageable.*" (Emphasis added). *Id.* ¶ 79. The Countrywide hole was not in fact manageable and it should have or was detected through BofA's due diligence process by December 2007, and therefore, publicly disclosed before or in conjunction with the corresponding registration statements and prospectus for the Offerings.

---

[6] The BAC Defendants argue that the pendency of litigation against Countrywide in 2007 put investors on inquiry notice of the defects in the Company's Offering Documents. *See* BAC Mem. at p. 13. There is no rational basis for this absurd argument which – even if true – underscores the materiality of the Company's January 11, 2008 positive public statements following its "extensive due diligence" of Countrywide.

**ARGUMENT**

Securities Act claims are governed by the notice pleading standard set forth in Fed. R. Civ. P. Rule 8(a), requiring "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 206 (S.D.N.Y 2004). In ruling on a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). All reasonable inferences are drawn in the plaintiffs' favor. *Beauchamp v. Financial Recovery Services, Inc.*, No. 10 Civ. 4864, 2011 WL 891320, at * 1 (S.D.N.Y. March 14, 2011). In order to survive a Rule 12(b)(6) motion the complaint here need only "contain sufficient factual matter… to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).[7]

The Securities Act of 1933 was designed "to provide investors with full disclosure of material information concerning public offerings." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).[8] To state a claim for violation of §11 of the 1933 Act, plaintiffs must allege the registration statement: (1) "contain[ed] an 'untrue statement of a material fact'"; (2) "omit[ed] to state a material fact required to be stated therein"; or (3) omitted to state a material fact "necessary to make the statements therein not misleading." *In re WorldCom Sec. Litig.*, 496 F. 3d 245, 248-49 (2d Cir. 2007)(*quoting* 15 U.S.C. §77k (a)). claims under §§ 11 and 12(a)(2) do

---

[7] Rather than viewing the FAC allegations in their totality, Underwriter Defendants attempt to narrowly cast this action as focused solely on the failure to adequately reserve for future loan losses. Underwriter Mem. at pp. 6, 11. This narrow approach contravenes well-established law requiring a court to consider a complaint's allegations as a whole. *See, e.g., In re WorldSpace Sec. Litig.*, No. 07 Civ. 2252, 2008 WL 2856519, at * 6 (S.D.N.Y. July 21, 2008).

[8] Detailed Securities Act legal standards are set forth in Pltf's Opp. BAC Mem. at pp.4-6

not require a plaintiff to allege scienter, reliance, or other elements of fraud. *Rombach v. Chang*, 355 F.3d 164, 169, n.4 (2d Cir. 2004). "Section 11 'places a relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact." *In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 201 (E.D.N.Y. 2000) (citation omitted). The FAC easily meets these standards. A §11 claim can be brought against the issuer, its directors or partners, underwriters, and accountants who are named as having prepared or certified the registration statement. *In re Worldcom Inc., Sec. Litig.*, No. 02-cv-3288, 2005 WL 335201, at * 2, 4 (S.D.N.Y. Feb. 14, 2005) (*citing* 15 U.S.C. § 77k(a)). Section 11 subjects the Underwriter Defendants to joint and several liability. *Id*. (*citing* § 77(k)(f)(1).

Section 12(a)(2) liability parallels the §11 standard for "any person who offers or sells securities by means of a prospectus containing material misstatements." *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007). A *prima facie* §12(a)(2) claim alleges that: (i) the defendant is a "statutory seller," (ii) the security was sold "by means of a prospectus or oral communication," which (iii) "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements… not misleading." *In re Morgan Stanley Information Fund Securities Litigation*, 592 F. 3d 347, 359 (2d Cir. 2010) (*quoting* 15 U.S.C. § 77l (a)(2)).

I. **PLAINTIFFS SATISFY §12(a)(2) STANDING REQUIREMENTS**

To satisfy §12(a)(2) standing, plaintiffs must allege that they directly purchased in the Offerings from a proper defendant. *In re Barclays Bank PLC Sec. Litig.,* No. 09-Cv-1989, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011). The FAC satisfies §12(a)(2) standing requirements. Specifically, the FAC alleges that on January 24, 2008 (the date of the Series K Offering),

NECA-IBEW, purchased Series K Securities "directly" from Defendant Banc of America Securities LLC. FAC ¶¶ 10, 20, 42.  The FAC similarly alleges that on May 20, 2008 (the date of the Series H Offering), Montgomery, acquired Series H Securities "through" Defendant Merrill Lynch. *Id.* at ¶¶ 12, 21, 44.

Specific allegations of the exact security purchased, along with the date of purchase, are sufficient to survive a motion to dismiss when coupled with allegations that plaintiffs purchased their securities directly from participating defendants of the public offering. *See e.g.*, *Public Employees' Retirement System of Mississippi v. Goldman Sachs Group Inc.,* No. 09-cv-1110, 2011 WL 135821, at *8 (S.D.N.Y. Jan. 12, 2011); *In re IndyMac Mortg.-Backed Sec. Litig.,* 718 F. Supp. 2d 495, 502 (S.D.N.Y. 2010) (rejecting dismissal where the complaint alleged that the plaintiffs had "purchased the Certificates 'pursuant to' the relevant Offering Documents, that is, in the relevant offerings . . . that defendants 'solicited, sold and distributed' the Certificates, that they purchased a specified number of Certificates on specified dates (some of which corresponded to the initial offering dates) at specified prices [and] that specific Underwriter Defendants were associated with each individual offering . . .").

In determining §12(a)(2) standing, courts look both to the face of the complaint and to the certificates incorporated by reference therein.  *Caiafa v. Sea Containers Ltd.,* 331 Fed. Appx. 14, 16 (2d Cir. 2009) (examining complaint and certifications); *In re Century Aluminum Co. Sec. Litig.,* 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010) (examining complaint and certification to determine whether plaintiffs purchased "on the date of the [] offering, or at the [] offering price").[9]  Plaintiffs have thus represented and sufficiently allege that they purchased their

---

[9] The certification attached to NECA-IBEW's motion for appointment as lead plaintiff pursuant to the PSLRA reflects that NECA-IBEW purchased 100,000 Series K preferred shares at the Offering price on January 24, 2008, the date of and in the Series K Offering and thereafter. [Dkt. No. 7-2, Exhibit A]. The

securities from a proper defendant in the Offerings and have standing for purposes of §12(a)(2).

Contrary to the Underwriter Defendants' contention, the FAC does not present an evasive circumlocution describing Plaintiffs' Series K and H securities purchases. To the contrary, details are given to each Plaintiffs' transaction and thus proper standing exists for purposes of a §12(a)(2) claim. *In re Barclays Bank PLC Sec. Litig.,* 2011 WL 31548, at *5 (*citing Plumbers' Union Local 12 Pension Fund v. Nomura Asset Acceptance Corp.,* 658 F. Supp. 2d 299, 305 (D. Mass. 2009) ("If plaintiff did in fact purchase the Certificates directly from the defendants, they should have said so.  An evasive circumlocution does not serve as a substitute."))[10]  Plaintiffs clearly provide plausible, if not compelling factual allegations establishing (and plausibly inferring) that each investor purchased in the Offerings directly from a proper Underwriter Defendant. FAC ¶¶ 10, 12, 20, 21, 42, 44.[11]

## II. PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

Like the BAC Defendants, the Underwriter Defendants' argue that Plaintiffs merely pled

---

certification attached to the original complaint reflects that Montgomery purchased 2,000 Series H preferred shares at the Offering price on May 20, 2008, the date of and in the Series H Offering. [Dkt. No. 1].

[10] In *Barclays Bank*, the complaint simply alleged that plaintiffs bought securities "pursuant or traceable to" the allegedly false and misleading offering materials with no other details concerning the plaintiffs' purchases to which the court acknowledged was a curable defect once counsel confirmed at oral argument that plaintiffs did in fact purchase directly from Barclays. *Barclays Bank*, 2011 WL 31548, at *6 n.16. Similarly, *In re Sterling Foster & Co., Inc., Sec. Litig.,* 222 F. Supp. 2d 216, 245 (E.D.N.Y. 2002), simply alleged that members of a subclass purchased their securities "pursuant to and traceable to" the prospectus without stating whether they were purchased during the offering as opposed to the secondary market.

[11] Underwriter Defendants insist that the FAC include the term "directly" when identifying the particular underwriter defendant from which Plaintiffs purchased their Series K and H Securities pursuant to the IPO. Semantics and any perceived concerns of NECA-IBEW's direct purchase from Banc of America Securities LLC and Montgomery's direct purchase from Merrill Lynch can be clarified and corrected if necessary to alleviate any §12(a)(2) standing concerns. *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08-cv-5653, 2010 WL 1473288, at * 4 (S.D.N.Y. Mar. 29, 2010) (granting leave to amend §12(a)(2) standing allegations). Should the Court conclude that greater clarity of this fact is warranted, then NECA-IBEW respectfully requests leave to amend.

by hindsight following an unforeseeable and once in a lifetime financial crisis. Underwriter Mem. at pp. 1-2, 5.  This assertion is incorrect and misleading.  Rather than alleging that the Offering Materials were false in light of later events, the FAC alleges that Defendants misstated *then-existing* facts causing a failure to properly record CDO and HEL losses, BofA's true capital base, impact of the CW acquisition, and deficient accounting practices at the time of the Offerings. *See* Pltf's Opp. BAC Mem. pp. 6-7, 16-21; FAC ¶¶ 4, 13, 71, 78-88, 98-103.   The evolving developments in the financial markets in late-2008 are immaterial to the lawsuit and did not provide Plaintiffs constructive or inquiry notice of specific facts and claims asserted by the FAC. *See* Pltf's Opp. BAC Mem. at p. 6-9.

Additionally, the Supreme Court recently rejected the use of inquiry notice to determine when the limitations period for a securities claim begins.  *See Merck & Co. v. Reynolds,* 130 S. Ct. 1784, 1787 (2010).  The Court clarified that the clock starts to tick "once the plaintiff did discovery or a reasonably diligent plaintiff would have discovered the facts constituting the violation – whichever comes first." *Id.*  Applying *Merck,* the Second Circuit elaborated that a fact is not deemed discovered until "plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularly to survive a 12(b)(6) motion to dismiss."  *City of Pontiac Gen. Emps., Ret. Sys, v. MBIA, Inc.,* No. 09-cv-4609, 2011 WL 677404, at *4 (2d Cir. Feb. 28, 2011).  *See also In Re Wachovia Equity Sec. Litig*, No. 08-cv-6171, 2011 WL 1344027, at *28-29 (S.D.N.Y. 2011) (applying *Merck* to claims under Section 11 and 12(a)(2) of the '33 Act).  As is the case with BofA's so-called disclosures and general market conditions of late-2008, the Underwriter Defendants also fail to provide specific information about which facts of the FAC put Plaintiffs on inquiry notice. *Public employees' Retirement System of Mississippi*, 2011 WL 135821, at *9 (holding "although defendants point to

13

a number of publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators, this information alone does not 'relate directly' to the misrepresentations and omissions alleged in the SAC"). *See also* Pltf's Opp. BAC Mem. at p.14. [12]

## III. THE FAC ALLEGES ACTIONABLE MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

For the reasons explained in detail in NECA-IBEW's Opposition to the BAC Defendants' motion to dismiss, Underwriter Defendants' narrow reading of the FAC ignores numerous actionable statements and omissions. The FAC does not simply assert challenges to subjective opinions of Defendants, nor is any Defendant's state of mind placed at issue.[13] *See* Pltf's Opp. BAC Mem. at pp. 3-4, 6-9. Underwriter Defendants' reliance on *Fait*, *Barclays Bank* and *Freidus* for the proposition that subjective opinions are only actionable if they are not truly

---

[12] Underwriter Defendants' reliance on *Freidus v. ING Groep N.V.,* 736 F. Supp. 816, 828 (S.D.N.Y. 2010), for the proposition that Plaintiffs' claims are time-barred is misplaced. In *Freidus*, plaintiffs alleged that defendant failed to disclose the specific details, amounts and characteristics concerning ING's RMBS holdings where the disclosure triggering inquiry notice - the announcement of a negative revaluation of its subprime RMBS portfolio - specifically disclosed the details and exact holdings of subprime and Alt-A RMBS identified in the complaint. No such detailed disclosures were made by BofA, BAC and Underwriter simply point to general market events of late-2008. Similarly, *Barclays Bank* involved a complaint filed more than a year after a trading update had been issued which put plaintiffs on inquiry notice as to their claims because the alleged omissions in the complaint challenged the exact same information disclosed in the trading update. *Barclays*, 2011 WL 31548, at *2, 6.

[13] For example, Underwriter Defendants' characterization of the FAC alleging "that BAC carried its mortgage and credit-related assets on its financial statements at inflated values and waited too long to write down those assets" or "failed to predict the future" (Underwriter Mem. at pp. 2, 11), is incorrect, misleading and fails to consider the FAC's allegations as a whole. which allege inadequate internal controls, the failure to properly record then-existing CDO and HEL losses and quarter-end transactions that caused the Company to incorrectly report its Tier 1 capital base which, if properly recorded, would have stripped BofA of its "well capitalized status" and, thus, its ability to effectuate the Offerings, as well as statements and omissions concerning the Countrywide Acquisition (and due diligence) that were false and misleading when made because the statements misrepresented the nature of the transaction and omitted material information concerning Countrywide's legacy loan portfolios and loan origination practices, and liabilities and risks assumed by BofA as a result of the acquisition.. FAC ¶¶ 4, 13, 71, 78-88, 98-103. .

14

believed is misplaced as this case is not narrowly tailored to and does not alleged BofA failure to predict and reserve for future. Underwriter Mem. at p. 11; *see also Fiat v. Regions Financial Corp.,* 712 F. Supp. 2d 117, 121, 125 (S.D.N.Y. 2010) (Kaplan, J.) (holding conclusory allegations that the provision for future loan losses and reserves was "woefully inadequate" insufficient to state a claim because whether defendant had adequate reserves for its predicted future loan losses is not a matter of objective fact and instead were statements of opinion as to the portion of the stated value of defendant's loans that would prove to be uncollectable).[14]  In contrast, the FAC alleges, *inter alia*, that BofA failed to properly record necessary and required CDO and HEL losses, causing the Company to incorrectly report its Tier 1 Capital base at the time of the Offerings. *See* Pltf's Opp. BAC Mem. pp. 6-7, 16-21

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny the Underwriter Defendants' motion to dismiss Counts I and II of the FAC in its entirety.  Should this Court perceive any portion of the FAC to be deficient, Plaintiffs respectfully request leave to amend the FAC to cure such perceived deficiencies. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.")

---

[14] *See Barclays Bank*, 2011 WL 31548, at *6 (allegations that defendant failed to timely and adequately disclose and write down its exposure to risky credit market assets while misleadingly assuring investors that extensive risk management practices based on valuation models to help avoid credit market risks held insufficient because valuation models required discretionary choices and subjective opinion of the modeler); *Freidus,* 736 F. Supp. at 836, is also unavailing as it concerned credit ratings of mortgage-backed securities made by third party rating agencies that were false and misleading in which the Court simply explained that such ratings are opinions and judgments of the particular rating agency, for a particular security.

Dated: May 6, 2011                                       **FINKELSTEIN & KRINSK LLP**


By:\_\_\_/s\_Jeffrey R. Krinsk_____
Jeffrey R. Krinsk (Admitted Pro Hac Vice)

Mark L. Knutson (Admitted Pro Hac Vice)
C. Michael Plavi II (Admitted Pro Hac Vice)
501 West Broadway, Suite 1250
San Diego, CA 92101
Tel: 619.238.1333

Attorneys for Plaintiffs and Lead Counsel for the Class

**KLAFTER, OLSEN & LESSER LLP**
Jeffrey Klafter
Two International Place, Suite 350
Rye Brook, NY 10573
Tel: 914.934.9200


Attorneys for Plaintiffs and Liaison Counsel for the Class