UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NECA-IBEW PENSION TRUST FUND and<br>DENIS MONTGOMERY, on Behalf of<br>Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION,<br>*et al.*,<br><br>Defendants. | )  Case No.  10-cv-00440 (LAK) (HBP)<br>)<br>)<br>)  CLASS ACTION<br>)<br>)<br>)  ECF CASE<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR LEAVE TO FILE A
SECOND AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiff NECA-IBEW Pension Trust Fund ("NECA-IBEW") and individual plaintiff Denis Montgomery (collectively "Plaintiffs"), respectfully submit this memorandum in support of their motion for leave to file a Second Amended Class Action Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 15(a). A redlined copy of the proposed SAC is attached as Exhibit A to the Declaration of C. Michael Plavi II, submitted concurrently.

## I.  PRELIMINARY STATEMENT

This motion follows the February 9, 2012 Report and Recommendation of U.S. Magistrate Judge Henry B. Pitman (the "R&R," Dkt. # 54) on the Bank of America Corporation ("BAC" Defendants) and Underwriter Defendants' separate motions to dismiss Plaintiffs' First Amended Complaint filed January 18, 2011 (the "FAC;" Dkt. # 25). The R&R recommends dismissal of all claims against all defendants for failure to state a claim, without prejudice to further amendment by formal motion. R&R, at pp. 77-78.

In this securities fraud action Plaintiffs seek leave pursuant to the Magistrate Judge's R&R to amend their operative pleading and file the attached SAC asserting the same violations of Sections 11, 12(a)(2), and 15 of the Securities Act (the "1933 Act") (15 U.S.C. §77a, *et seq*.), as the FAC. Plaintiffs seek leave to file the proposed SAC adding detailed factual allegations to support their 1933 Act claims and also to address certain items raised in the R&R. Plaintiffs' motion should be granted because this litigation is still in its earliest stages and defendants will suffer no prejudice in allowing Plaintiffs' amended pleading.

1

## II. FACTUAL BACKGROUND

### A. PROCEDURAL HISTORY

The action was commenced as a putative class action against Bank of America ("BofA")

on January 18, 2010. On July 15, 2010, NECA-IBEW Pension Trust Fund ("NECA-IBEW")

was appointed as Lead Plaintiff. (Dkt. # 5). On January 14, 2011, Lead Plaintiff filed the FAC.

(Dkt. # 25). On March 4, 2011, the BAC Defendants and Underwriter Defendants moved to

dismiss all claims of the FAC. Motions to dismiss were fully briefed on June 10, 2011. On

February 9, 2012, Magistrate Judge Pitman issued the R&R. (Dkt. # 54). On February 23, 2012,

Plaintiffs filed objections to the R&R. (Dkt. # 55). While Plaintiffs believe their objections

should be sustained, Plaintiffs therein notified the Court of their intention to file this motion for

permission to file an amended pleading providing additional support for their claims.

### B. THE PROPOSED SECOND AMENDED COMPLAINT

Plaintiffs' proposed SAC arises from the same course of conduct and alleges the same

1933 Act violations as the FAC. The SAC provides additional detailed factual allegations

following the R&R. *See generally*, redlined portions of the proposed SAC.[1]

#### 1. Accounting Allegations

The SAC provides additional facts and allegations supporting non-disclosure of BofA

accounting principles and failure to account for and write-down collateralized debt obligations

("CDO") related losses at the time incurred, making the Offering documents materially

---

[1] Redline notations in the proposed SAC indicate additions and/or changes to the FAC. Recognizing that certain redlined additions may cause duplication of allegations and/or citations to SEC filings, nonetheless, similar or overlapping references from the FAC were not removed or altered in order to provide the most clear redlined representation of the modifications in the proposed SAC.

2

misleading. *See* SAC ¶¶ 10, 16-17, 71-97.[2] Specifically, that BofA's senior management chose, by design and without prior public disclosure, to remove its entire CDO portfolio and CDO-related assets from the scrutiny of the Company's Value-at-Risk statistical model and other internal financial risk controls beginning in the third quarter 2007 and continuing through the balance of that year. *Id.*, at ¶¶ 10, 16, 97, 146(c). In so doing, BofA deviated from and violated its financial reporting obligations under generally accepted accounting principles ("GAAP") and certain Statement of Financial Accounting Standards ("SFAS") promulgated by the Financial Accounting Standards Board ("FASB"). *Id.*, at ¶¶ 10, 86-87, 95.

Additional factual allegations include, *inter alia*, that, during the relevant period, BofA consistently used an objectively-based, statistical model, known to BofA as "Value-at-Risk" ("VAR"), to "measure *and* manage" as part of the Company's internal financial controls the market risk inherent in its CDOs and other structured products. *Id.*, at ¶¶ 15, 78-82. The SAC further details and alleges that the Company failed to disclose, prior to the January 2008 preferred stock offerings, that **all** CDOs had been removed from the Bank's VAR model results reported in the Company's 3Q '07 Form 10-Q, and also excluded such results from the results of operations reported in the Bank's 4Q '07 "Supplemental Information – Fourth Quarter" Form 8-K filing. *Id.*, at ¶¶ 83-86, 97. BofA also failed to disclose that **all** CDOs – even those that it highly touted in its 3Q '07 Form 10-Q as being collateralized beyond that necessary for AAA rating – and the accompanying MBSs in its CDO warehouse (and associated derivative assets) had been excluded from the Bank's VAR model and the financial results reported in the Company's SEC filing due to their extreme illiquidity. *Id.*, at ¶¶ 85, 104.

---

[2] Unless otherwise noted, all paragraph references herein refer to the proposed SAC submitted herewith.

3

As a result, BofA was able to avoid the reporting and disclosure of the Company's asset management requirements applicable under VAR and its internal financial risk controls had the CDOs remained in the VAR model during these two crucial quarters, *infra*, *i.e.*, that senior management would have been notified of, and reviewed and evaluated all VAR excess trading limits on a daily basis, and implemented "proactive measures ... to adjust risk levels" – including the taking of appropriate asset losses/write downs required under GAAP/FASB to "*measure and manage*" BofA's exponentially degrading CDO portfolio. *Id.*, at ¶¶ 87.

Accordingly, by removing the "super senior" CDOs from VAR in 3Q '07 – which constituted all of the Bank's CDOs and their corresponding MBSs and derivative assets – BofA's senior management (which includes the Individual Defendants) chose, by design, to mask the Company's true CDO loss exposure to the investing public and delay appropriate asset write downs and the taking of loss reserves for BofA's CDO portfolio during the second half of 2007. *Id.*, at ¶¶ 10, 97. That decision negatively impacted, in a material fashion, the accuracy of its publicly reported results of operations for this reporting period, and also misrepresented the Bank's Tier 1 capital and leverage ratios as being "well capitalized" at year-end 2007 when, in fact, BofA was only "adequately capitalized." *Id.*, at ¶¶ 96, 143, 146(f), 151. Had these assets/loan write downs and loss reserves timely taken place as they should have, this would have caused BofA's Tier 1 risk-based capital and Tier 1 leverage ratios to tumble to 6.25% and 4.58%, respectively – thus forcing BofA to reduce its federal banking rating from "well capitalized" to "adequately capitalized" at year end 2007. *Id.*, at ¶¶ 16, 96, 143-144. Instead, BofA waited to disclose the above facts until after the completion of the Company's January 24th Series K and January 28th, 2008 Series L Offerings, in order to facilitate BofA's efforts to raise $12.9 billion in new capital to recapture its "well capitalized" designation. *Id.*, at ¶¶ 97.

4

In addition, the Sarbanes-Oxley Act Section 302 certifications executed by Individual Defendants Lewis and Price and appended to BofA's 3Q '07 Form 10-Qs were false because the Form 10-Q did not, in fact, disclose the Bank's material change in its internal VAR controls occasioned by the Company's removal of its $19 billion CDO portfolio from VAR during that reporting period. ¶¶ 26-27, 88.

### 2. Internal Control Allegations

In response to Magistrate Judge Pitman's R&R, the SAC includes additional allegations concerning representations in Sarbanes-Oxley certifications, which confirm the adequacy of the BofA's accounting practices, procedures and controls and accurate financial reporting. ¶¶ 139-140. For example, the SAC also addresses items raised by the R&R concerning BofA's internal controls and admissions that the Company "mistakenly" and "improperly," due to inadequate internal controls, accounted for as much as $28 billion in residential mortgage-backed securities transactions between 2007 and 2009 by engaging in improper quarter-end repurchase transactions (known as "Dollar Rolls" or "Repo to Maturity" transactions), particularly those which occurred on March 31, 2007 ($4.5 billion) and December 31, 2007 ($2.0 billion), just prior to the Countrywide Acquisition announcement and Series K Offering. ¶¶ 141-142.

### 3. Countrywide Acquisition Allegations

The SAC also sets forth additional facts and allegations following the R&R (at pp. 65-69, 71-72) concerning false and misleading statements made by BAC Defendants in connection with the Countrywide Acquisition announcement and Defendant Lewis's January 11, 2008 statement that much of the current Countrywide loan originations were of higher quality and that spreads were improving when, in fact, they were not. ¶¶ 121, 127.131. As detailed in the SAC, according to documents and data provided by BofA to the Financial Crisis Inquiry Commission

5

("FCIC") identifying Countrywide loan originations by quarter from 2003-2007, including

borrower FICO scores and combined loan-to-value ratios ("CLTV"), Countrywide loan

originations were substantially similar throughout 2007 to those in prior years and in certain

instances, were even worse during the fourth quarter of 2007.[3] *Id.*, at ¶¶ 129.  For example,

FICO scores on Countrywide originations in the fourth quarter and throughout 2007, were

substantially similar to years 2004-2006: ranging from a weighted average FICO score of 705 in

the first quarter of 2004, to a weighted average of 703 in the first quarter 2007, 706 in the second

and third quarters of 2007, and 712 in the fourth quarter 2007.  *Id.*

Likewise, the SAC provides additional factual allegations that Countrywide originations

CLTV's in the fourth quarter of 2007, were also substantially similar to years 2004-2006.  For

example, the weighted average CLTV on Countrywide originations in the fourth quarter 2007

was 79% (and 79-80% in the first through third quarters of 2007).  ¶ 130.  In comparison to

2007, CLTV for Countrywide originations years 2004-2006 were virtually identical with CLTV

weighted averages of 79-81%. *Id.*  Countrywide originations throughout 2007 with CLTV with

greater than 85% and 90% were likewise comparable to years 2004-2006.  Moreover,

Countrywide originations in the second, third and fourth quarter 2007, with greater than 100%

---

[3] The FCIC was created to "examine the causes, domestic and global, of the current financial and
economic crisis in the United States." The Commission was established as part of the Fraud
Enforcement and Recovery Act (Public Law 111-21) passed by Congress and signed by the
President in May 2009.  The FCIC issued its final report on January 2011 and thereafter made
public various documents, proceedings and testimony available to the public. A copy of the
document entitled Countrywide Responses to June 23 Request was released to the public and
bears bates identifier BAC-FCIC-00000055785 which was provided by Bank of America
Corporation to the FCIC.  The document provides information concerning Countrywide
Financial Corporation Loan Originations by Quarter from 2003-2007. A copy of the document
identified as 0000-00-00 Countrywide Originatons by Quarter from 2003 to 2007.pdf can be
found on the FCIC website using the following link
http://fcic.law.stanford.edu/resource/index/page:5/Search.keywords:countrywide%20Search.Vid
eos:1/Search.Documents:1/Search.Interviews:1/Search.endmonth:03/Search.endyear:2012

CLTV, were higher than all quarters for years 2004-2006. *Id.*

In addition, according to the FCIC's final report, Countrywide had total residential mortgage originations of $245 billion in the first half of 2007, which accounted for 17 percent of all mortgage originations in that period. ¶ 128. Countrywide also issued $41 billion in prime jumbo and Alt A RMBS in the first half of 2007, making it the largest issuer in this category, accounting for 13 percent of the total originations. Countrywide was also the largest issuer of subprime RMBS in the first half of 2007, with $14.3 billion issued. *Id.* As such, Countrywide originations in the then current market were not in fact of "much higher quality". *Id.*, at ¶ 131.

### 4. Standing Clarification

Lastly, the SAC confirms that Plaintiffs purchased their shares of the BofA Offerings directly from Underwriter Defendants in connection with each Offering to alleviate any challenge or concern regarding Plaintiffs' §12(a)(2) standing. ¶¶ __.

## III.    ARGUMENT

### A. RULE 15(a) PROVIDES A LIBERAL STANDARD FOR AMENDMENT

Federal Rule of Civil Procedure 15(a) provides that leave to amend should be freely granted when justice so requires. Fed. R. Civ. P., Rule 15; *see also Del Rosario v. NYC Dep't of Corrections*, No. 07-cv-2027 (RJS) (MHD), 2009 WL 1470482, at *1 (S.D.N.Y. May 15, 2009) (noting that leave to amend should be "freely given") (internal citations omitted). This standard has long been characterized as liberal. *See, e.g., Slayton v. Am Express Co.*, 460 F. 3d 215, 230 (2d Cir. 2006) ("Leave to replead is to be liberally granted."). "It is settled that the grant for leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." *SCS Coom'ns, Inc. v. Herrick Co., Inc.*, 360 F. 3d 329, 345 (2d Cir. 2004) (*quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802 (1971)). Further,

7

"refusal to grant leave must be based on a valid ground." *Ronzani v. Sanofi S.A.*, 899 F. 2d 195, 198 (2d Cir. 1990).

Motions for leave to amend made pursuant to Rule 15(a) may be denied only where there is a showing of undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or futility. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962); *Richardson Greenshields Sec., Inc. v. Mui-Hin Lau*, 825 F.2d 647, 653 n. 6 (2d Cir. 1987) (same) (*quoting State Teachers Ret. Bd. v. Fluor Corp.*, 654 F 2d. 853, 856 (2d Cir. 1981)); *see also O'Hara v. Weeks Marin, Inc.,* 294 F. 3d 55, 70 (2d Cir. 2002) (considerations of undue delay and prejudice to the opposing party are touchstones of a district court's discretionary authority to deny leave to amend.) (Brackets and ellipses omitted.)

## B. PLAINTIFFS' MOTION FOR LEAVE TO FILE THE SAC SHOULD BE GRANTED

The circumstances in this case fully warrant a granting of leave to amend under Rule 15(a). There is no evidence of undue delay, bad faith, dilatory motive or prejudice to defendants, nor are the amendments of the proposed SAC futile.

### 1. Plaintiffs' Motion and the SAC is Timely, Not the Result of Bad Faith or Dilatory Motive

This lawsuit was commenced in January 2010. Plaintiffs' FAC was filed on January 18, 2011. The R&R on Defendants' motions to dismiss the FAC was issued on February 9, 2012. No answers have been filed and no discovery has been taken. Thus, there has been no undue delay. Plaintiffs' motion and the proposed SAC is not sought in bad faith or through dilatory motive, nor is there any evidence to the contrary.

8

### 2.   There is No Prejudice to Defendants

No Defendant will suffer undue prejudice as a result of the amended pleading. In determining what constitutes "prejudice," courts generally consider whether the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) require significant additional resources to conduct discovery and prepare for trial; (iii) significantly delay the resolution of the dispute; or (iv) prevent the plaintiff from bringing a timely action in another jurisdiction. *See e.g.*, *Monahan v. New York City Dept. of Corr.*, 214 F3d 275, 284 (2d Cir. 2000). This case is currently at the pleading stage. This is not a circumstance in which Plaintiffs have had several "bites at the apple." The proposed amendments arise out of the same course of conduct alleged in the FAC. The claims of the SAC have not been altered. Discovery has not begun and no trial date has been set. As a result, no undue prejudice will result if Plaintiffs' motion is granted.

### 3.   The Amendments of the Proposed SAC are Not Futile

The additional facts and allegations set forth in the SAC stem from the findings of Magistrate Judge Pitman's R&R, as well as, information that became available after the Plaintiffs' filed their FAC that relate directly to the preferred stock Offerings and events at issue in this lawsuit. These factual allegations arise out of the same course of conduct alleged in the FAC and will allow the Court to make a decision based upon the merits of the Plaintiffs' claims. *See Union Carbide Corp. v. Siemens Westinghouse Power Corp.*, No.99 Civ. 12003 (LMM), 2002 U.S. Dist. LEXIS 20190, at *10 (S.D.N.Y. Oct. 23, 2002) (holding that amendment is appropriate where the amended complaint "is closely related to the original claim and is based on a similar set of operative facts"). Moreover, as detailed in Plaintiffs' objections to the R&R (Dkt. # 55), Magistrate Judge Pitman confounded and incorrectly applied the heightened

9

pleading and scienter requirements attendant to §10(b) of the 1934 Act instead of the applicable standards under §11 and §12(a)(2) of the 1933 Act claims in this case. *In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347, 360 (2d Cir. 2010) (in contrast to their " 'catchall' " cousin in the Exchange Act—section 10(b),…[s]ections 11 and 12(a)(2) of the Securities Act apply more narrowly but give rise to liability more readily) (citations omitted).

As set forth in § II.B.1-4, *supra*, and further detailed in the proposed amended pleading, the SAC sets forth additional factual allegations supporting the *bona fide* claims of this lawsuit.

## IV.   CONCLUSION

For reasons stated herein, Plaintiffs' motion for leave to file the proposed SAC should be granted.

Dated: March 15, 2012                    Respectfully submitted,

**FINKELSTEIN & KRINSK LLP**

By:___/s/_Jeffrey R. Krinsk_____
Jeffrey R. Krinsk (Admitted Pro Hac Vice)
Mark L. Knutson (Admitted Pro Hac Vice)
C. Michael Plavi II (Admitted Pro Hac Vice)
501 West Broadway, Suite 1250
San Diego, CA 92101
Tel: 619.238.1333

Attorneys for Plaintiffs and Lead Counsel
for the Class

**KLAFTER, OLSEN & LESSER LLP**
Jeffrey Klafter
Two International Place, Suite 350
Rye Brook, NY 10573
Tel: 914.934.9200

Attorneys for Plaintiffs and Liaison Counsel
for the Class

10