UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NECA-IBEW PENSION TRUST FUND and ) Case No. 10-cv-00440 (LAK) (HBP)
DENIS MONTGOMERY, on Behalf of )
Themselves and All Others Similarly Situated, )
) CLASS ACTION
               Plaintiffs, )
)
        v. ) ECF CASE
)
BANK OF AMERICA CORPORATION, )
*et al.*, )
)
              Defendants. )
_____ )

**REPLY IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR LEAVE TO FILE A**
**SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLES OF CONTENTS

Page

I.     PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT . . . . . . . . . . . . 1

II.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

       A.  THE PROPOSED SAC DOES NOT SOUND IN FRAUD. . . . . . . . . . . . . . . . . . . . 3

       B.  THE DEFENDANTS' NEGLIGENT FAILURE TO WRITE DOWN ASSETS,
           EFFECT CHARGE-OFFS, AND DISREGARD OF INTERNAL FINANCIAL
           CONTROLS ARE ALLEGATIONS OF OBJECTTIVE FACTS. . . . . . . . . . . . . . . . 5

       C.  BAC'S POSITIVE PUBLIC STATEMENT ABOUT COUNTRYWIDE'S
           "CURRENT MARKET" LOAN ORIGINATIONS ARE ACTIONABLE. . . . . . . . 10

       D.  PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED. . . . . . . . . . . . . . . . . . . . . . . . 14

III.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TABLE OF AUTHORITIES

### CASES

Page

*Arfa v. Mecox Lane Limite*
No. 10-cv-9053, 2012 WL 697155 (S.D.N.Y Mar. 5, 2012) . . . . . . . . . . . . . . . . . . . . . .3,4

*Atlas v. Accredited Home Lenders Holding Co.*
556 F. Supp. 2d 1142 (S.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*In re Barclays Bank PLC Sec. Litig.*
No. 09-cv-1989, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) . . . . . . . . . . . . . . . . . . . . . . .11

*In re Bear Stearns Companies, Inc. Sec., Deriv. and ERISA Litig.*
763 F.Supp.2d 423 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6,9

*In re Bear Stearns Mortgage Pass-Through Cert. Litig,*
No. 08-cv-8093, __ F.Supp.2d __, 2012 WL 1076216 (S.D.N.Y. Mar. 30, 2012) . . . . .15

*Brecher v. Citigroup Inc.*
No. 09-cv-7359, 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011) . . . . . . . . . . . . . . . . . . . .15

*Bridgeway Corp. v. Citibank, N.A.*
132 F.Supp.2d 297 (S.D.N.Y.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*In re Citigroup Inc. Bond Litig.*
723 F.Supp.2d 586 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*In re Citigroup Inc. Sec. Litig.*
753 F.Supp.2d 206 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7,12

*City of Pontiac General Employees' Retirement System v. MBIA, Inc.*
637 F.3d 169 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14,15,16,17

*City of Roseville Employees' Retirement System v. EnergySolutions, Inc.*
814 F.Supp.2d 395 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Countrywide Fin. Corp. Sec. Litig.*
588 F. Supp. 2d 1132 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*In re Deutsche Bank AG Sec. Litig.*
No. 09-cv-1714, 2011 WL 3664407 (S.D.N.Y. Aug. 19, 2011) . . . . . . . . . . . . . . . . . . . .7

*In re Direxion Shares ETF Trust*
No. 09-cv-80911, 2012 WL 717967 (S.D.N.Y. Mar. 6, 2012) . . . . . . . . . . . . . . . . . . . . .15

*Employees' Retirement System of the Government of the Virgin Islands v.*
*J.P. Morgan Chase & Co.*
    804 F.Supp.2d 141 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5,6

*Freidus v. ING Groep N.V.*
    736 F.Supp.2d 816 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*In re General Electric Co. Sec. Litig.*
    No. 09-cv-1951, __ F.Supp.2d __, 2012 WL 90191 (S.D.N.Y. Jan. 11, 2012) . . . . . . . . 6

*In re Global Crossing, Ltd. Sec. Litig.*
    322 F.Supp.2d 319 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Lehman Bros. Sec. Litig.*
    684 F.Supp.2d 485 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Lehman Bros. Sec. and ERISA Litig.*
    799 F.Supp.2d 258 (S.D.N.Y 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7,9

*Lentell v. Merill Lynch & Co. Inc.*
    396 F.3d 161 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Litwin v. The Blackstone Group, L.P.*
    634 F.3d 706 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,10,11,13

*Merck & Co. v. Reynolds*
    __ U.S. __, 130 S.Ct. 1784 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14,15,16,17

*In re New Century*
    588 F.Supp.2d 1206 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*
    No. 08-cv-5093, 2011 WL 2020260 (S.D.N.Y. May 19, 2011) . . . . . . . . . . . . . . . . . . .15

*In re Noah Educational Holdings, Ltd. Sec. Litig.*
    No. 08 Civ. 9203, 2010 WL 1372709 (S.D.N.Y. Mar.31, 2010) . . . . . . . . . . . . . . . . . .17

*In re Nortel Networks Corp. Sec. Litig.*
    238 F.Supp.2d 613, 629 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*P. Stolz Family Partnership L.P. v. Daum*
    355 F.3d 92 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9,17

*Plumbers' & Pipefitters' Local # 562 Supplemental Plan & Trust v.*
*J.P. Morgan Acceptance Corporation I*
No. 08-cv-1713, 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) . . . . . . . . . . . . . . . . .15,17

*In re RAIT Financial Trust Sec. Litig.*
No. 07-cv-3148, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) . . . . . . . . . . . . . . . . . . . . 14

*In re Refco, Inc. Sec. Litig.*
503 F.Supp.2d 611 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Rombach v. Chang*
355 F.3d 164 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

*In re Sadia, S.A. Sec. Litig,*
643 F.Supp.2d 521 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Schiavone v. Fortune*
477 U.S. 21 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*In re Scholastic Corp. Sec. Litig.*
252 F.3d 63 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Staehr v. Hartford Financial Services Group, Inc.*
547 F.3d 406 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Stratte-McClure v. Morgan Stanley*
784 F.Supp.2d 373 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7,12,13

*In re Vivendi Universal, S.A. Sec. Litig,*
No. 02-cv-5571, 2004 WL 876050 (S.D.N.Y. April 22, 2004) . . . . . . . . . . . . . . . . 12,13

*In re Wachovia Equity Sec. Litig.*
753 F.Supp.2d 326 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,15

## STATUTES

15 U.S.C. § 77(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 U.S.C. § 77m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

15 U.S.C. § 77l(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

15 U.S.C. § 7241(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed.R.Civ.Proc. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,5

Fed.R.Civ.Proc. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,16

Fed.R.Civ.Proc. 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed.R.Civ.Proc. 15(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

## GLOSSARY OF STANDARD ABBREVIATIONS

"ABSs" – Asset-Backed Securities

"BAC" - Bank of America Corporation

"BAC Defendants" - Bank of America Corporation; Kenneth D. Lewis; Joe L. Price; Neil A. Cotty; William Barnet, III; Frank P. Bramble, Sr.; John T. Collins; Gary L. Countryman; Tommy R. Franks; Charles K. Gifford; W. Steven Jones; Walter E. Massey; Thomas J. May; Patricia E. Mitchell; Thomas M. Ryan; O. Temple Sloan, Jr.; Meredith R. Spangler; Robert L. Tillman; and, Jackie M. Ward. [SAC ¶¶ 25-44].
"CEO" - Chief Executive Officer

"CDOs" - Collateralized Debt Obligations

 "CLTV"-Combined Loan-to-Value Ratio

"Countrywide" - Countrywide Financial Corporation

"FAC" - First Amended Class Action Complaint [Dkt # 25]

"FASB" - Financial Accounting Standards Board

"FCIC" - Financial Crisis Inquiry Commission

"FDIC" – Federal Deposit Insurance Corporation

"FICO Score" – Credit score model developed by the Fair Isaac Corporation

 "GAAP" - Generally Accepted Accounting Principles

"HEL" - Home Equity Loan

"Lewis" - Defendant Kenneth D. Lewis, BAC CEO during the relevant period

 "MBSs"- Mortgaged-Backed Securities

"Plaintiffs" - Lead Plaintiff NECA-IBEW Pension Trust Fund and plaintiff Denis Montgomery

"PSLRA" - Private Securities Litigation Reform Act of 1995

"R&R" - Report and Recommendation [Dkt # 54]

"RMBS" – Residential Mortgaged-Backed Securities

"SAC" - Second Amended Class Action Complaint

"SEC" - U.S. Securities and Exchange Commission

"Securities Act" - Securities Act of 1933; 15 U.S.C. §§ 77a, *et seq*.

"SFAS" - Statements of Financial Accounting Standards

"Sarbanes-Oxley"- Sarbanes-Oxley Act of 2002

"Underwriter Defendants" - Banc of America Securities LLC; Citigroup Global Markets, Inc.; Deutsche Bank Securities; J.P. Morgan Securities, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley & Co., Inc.; UBS Securities LLC; and, Wachovia Capital Markets, LLC (n/k/a/ Wells Fargo Securities, LLC). [SAC ¶¶ 45-52].

"VAR" - Value-at-Risk

vi

Lead Plaintiff NECA-IBEW Pension Trust Fund and individual plaintiff Denis Montgomery

(jointly, "Plaintiffs"), respectfully submit this Reply in support of their motion for leave to file a

Second Amended Class Action Complaint ("SAC") pursuant to Fed.R.Civ.Proc. 15(a).

## I. PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

The SAC asserts actionable claims against defendants under the Securities Act of 1933

[15 U.S.C. §§ 77a, *et seq*.] ("Securities Act") resulting from the BAC Defendants' non-

disclosure of the removal of $26.2 billion in collateralized debt obligations ("CDOs") and related

assets from BAC's "Value-at-Risk" ("VAR") model.[1]  This non-public *de facto* reclassification

of assets occurred after BAC had publicly announced its retroactive (to January 1, 2007)

adoption of Statements of Financial Accounting Standards ("SFAS") 157 and 159 for its CDO

and home equity loan contract ("HELs") portfolios. This, in turn, caused BAC to avoid taking

$5.5 billion of write-downs for these assets at year-end 2007,[2] thereby causing BAC to materially

overstate its Tier 1 capital and leverage ratios and, *ergo*, render BAC's Series K and H Securities

Offerings materially false and/or misleading. In addition, the January 11, 2008 public "good

news" statement by BAC's then-CEO Kenneth D. Lewis that the "current market" loan

originations of Countrywide Financial Corporation ("Countrywide") were of "much higher

quality and better spreads than the past couple of years" was untrue.

More specifically, the SAC includes additional factual allegations (and citations to

---

[1] The "BAC Defendants" are: Bank of America Corporation ("BAC"); Kenneth D. Lewis; Joe L.
Price; Neil A. Cotty; William Barnet, III; Frank P. Bramble, Sr.; John T. Collins; Gary L.
Countryman; Tommy R. Franks; Charles K. Gifford; W. Steven Jones; Walter E. Massey;
Thomas J. May; Patricia E. Mitchell; Thomas M. Ryan; O. Temple Sloan, Jr.; Meredith R.
Spangler; Robert L. Tillman; Jackie M. Ward; and, Banc of America Securities LLC. SAC ¶¶
25-44.

[2] While, the R&R (p. 29) stated that SFAS 157 and 159 were only adopted by BAC for "certain
large corporation clients," BAC's <u>actual</u> SEC filings prove otherwise. *See* SAC ¶¶ 71-77.

BAC's filings with the U.S. Securities and Exchange Commission ("SEC") and the U.S.

Financial Crisis Inquiry Commission ("FCIC")) validating its claims that BAC misrepresented

and/or failed to disclose known material adverse facts pertaining to these two principal issues

(BAC overvaluation of its CDO/HEL portfolios, and the quality of Countrywide's current loan

originations) in connection with BAC's Series K and H Offerings.[3]  The facts dictating this

conclusion include that:

1. BAC adopted SFAS 157 and 159 during the first half 2007 (retroactive to January 1, 2007) and valued its CDOs as marked-to-market (SAC ¶¶ 71-77);

2. In July 2007, BAC (without public disclosure) altered its "Value-at-Risk ("VAR") reporting protocol that had resulted in the removal of its $26.2 billion portfolio of CDOs from mark-to-market treatment and consequentially allowed BAC's senior management from to defer an additional $5.5 billion in CDO/ HEL write downs at year-end 2007 (SAC ¶¶ 83-86).  This result is because BAC treated the valuation of its CDO assets as being subject to "significant management judgment or estimation" (SFAS 157, Level 3) rather than its previous publicly reported valuation standard under SFAS, Level 2 (*ibid.*).  This *de facto* asset reclassification and valuation materially altered BAC's publicly disclosed VAR model and risk management protocols that were designed to "measure and manage" market risk inherent in CDOs as they sat in BAC's asset portfolios – a transparent circumvention of transparent financial reporting (*ibid.* ¶¶ 74-82, and the SEC filings cited therein);

3. BAC failed to publicly disclose the impact of its CDO/HEL asset classification to its calculation of Tier 1 ratios at year-end 2007 which, if properly recognized, would have lowered BAC's "well capitalized" FDIC bank rating to "adequately capitalized," and would have negatively affected the pricing of the Series K and H Offerings  (*ibid.* ¶¶ 83-96); and,

4. BAC knew, by virtue of its "extensive due diligence" of Countrywide's operations conducted at year-end 2007 (involving more than 60 BAC employees over 30 days), that the quality of Countrywide's new loan originations in the "current market" were not of "much higher quality or better spreads than the past couple of years" as publicly stated by BAC (though its CEO) on January 11, 2008 (*ibid.* at ¶¶ 121-122, 126-131).

---

[3] Excerpts of BAC's SEC filings cited in Plaintiff's SAC and this Reply are attached to the Declaration of C. Michael Plavi, II in Support of Reply to Motion for Leave to File Second Amended Complaint ("Plavi Decl.") in chronological order as Exhibits B-M.

Accordingly, the SAC addresses the pleading deficiencies described by this Court's February 9, 2012 Report and Recommendation ("R&R," Dkt # 54) in response to separate Fed.R.Civ.Proc. 12(b)(6) motions to dismiss Plaintiffs' First Amended Complaint ("FAC") by BAC Defendants and the Underwriter Defendants.[4]

## II. ARGUMENT

### A. THE PROPOSED SAC DOES NOT SOUND IN FRAUD

Although not advanced as a separate argument in their Opposition, the BAC Defendants contend that the SAC "sounds in fraud" and, as such, should be bound by the heightened pleading standards required by Fed.R.Civ.Proc. 9(b). BAC Opp. at pp. 7-8. Yet, neither the BAC Defendants nor the Underwriter Defendants contend that the SAC's allegations touch upon Defendants' "mental state [as] embracing [the] intent to deceive, manipulate or defraud" – "key elements" for asserting fraud under the Securities Act. *Arfa v. Mecox Lane Limited*, No. 10-cv-9053, 2012 WL 697155, *5 (S.D.N.Y Mar. 5, 2012), *citing In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 329 (S.D.N.Y. 2004).

Rather, the SAC details that BAC's third quarter 2007 decision to remove, without public disclosure, its highly risky $26.2 billion CDO portfolio from the Bank's VAR model and asset stress testing was done "by design," "by management design," "intentionally implemented," and that "senior management ... chose, by design, chose to ignore these material facts and circumstances ... as a means to avoid having to publicly report the mark-to-market value of these financial products." *See, e.g.*, SAC ¶¶ 10, 16, 95 and 97. Had this reclassification not occurred,

---

[4] The "Underwriter Defendants" are: Citigroup Global Markets, Inc.; Deutsche Bank Securities; J.P. Morgan Securities, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley & Co., Inc.; UBS Securities LLC; and, Wachovia Capital Markets, LLC (nka Wells Fargo Securities, LLC). SAC ¶¶ 45-52.

3

BAC would have recorded <u>an additional</u> $5.5 billion ($4.5 billion CDOs and $1.5 billion HELs) of asset write downs at year-end 2007. SAC ¶¶ 16, 95-97, 138. This would have materially impacted BAC, at year-end 2007, by capital constraints following its October 1, 2007, $21 billion <u>cash</u> purchase of LaSalle Bank Corporation, a situation exacerbated by its own rapidly deteriorating structured asset portfolios. *Id.* at ¶¶ 102-105. If properly taken in 2007, the SAC alleges, BAC's Tier 1 leverage ratio at year-end 2007 would have been 4.58%, a significant difference materially affecting the pricing of BAC's January 24, 2008, $6 billion Series K Offering. *Id.* at ¶¶ 95-97.

The allegations of improper asset treatments do not transform the SAC's claims into a lawsuit sounding in fraud. As recognized, in *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 631-632 (S.D.N.Y. 2007), "[f]raud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, <u>whether intentionally, negligently or innocently made) does not make it fraudulent.</u>" *Id.* (emphasis added). *Accord Arfa*, *supra*, 2012 WL 697155, *5 (allegations that the defendants "made untrue statements in the registration statement notwithstanding the availability of more accurate information," did not render complaint sounding in fraud where "there are no accusations that the Defendants acted with the intent to deceive, manipulate or defraud"). Indeed, Judge Kaplan recently recognized in *Freidus v. ING Groep N.V.*, 736 F.Supp.2d 816, 826-827 and n.55 (S.D.N.Y. 2010), "allegations that defendants <u>acted intentionally</u> because they allegedly '<u>chose not to review</u>' and '<u>ignored</u>' certain evidence" ... and otherwise "<u>had a motive to act</u> as it did," do <u>not</u> sound in fraud for purposes of the Securities Act. *Id.* (emphasis added). *See also City of Roseville Employees' Retirement System v. EnergySolutions, Inc.*, 814 F.Supp.2d 395, 424 n.12 (S.D.N.Y. 2011) (allegations of defendants' "known falsehoods" in violation of the Securities Act did not sound in fraud.

"[P]laintiffs must be allowed leeway to draft their complaint in a comprehensive narrative

form"); *In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 375 (S.D.N.Y. 2011) ("wording of

the [complaint that] merely tracks the language of Section 11, which requires a plaintiff to allege

materially untrue statements or omissions that render a document false or misleading" does not

cause a complaint to sound in fraud); *Employees' Retirement System of the Government of the

Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F.Supp.2d 141, 152-153 (S.D.N.Y. 2011)

(allegation that "loan originators deviated from underwriting standards 'as a matter of course'"

do not sound in fraud).[5]

## B. THE DEFENDANTS' NEGLIGENT FAILURE TO WRITE DOWN ASSETS, EFFECT CHARGE-OFFS, AND DISREGARD OF INTERNAL FINANCIAL CONTROLS ARE ALLEGATIONS OF OBJECTTIVE FACTS

The SAC's allegations also now support Plaintiffs' claim that BAC negligently failed to

disclose the changes in CDO asset reclassification and/or SFAS accounting principles.

Objectively, BAC failed to take write-downs on CDOs/HELs as required at year-end 2007, thus

making the Series K and H Offering documents materially misleading. *See* SAC ¶¶ 10, 16-17,

71-97, 137-138. BAC's removal of its entire $26.2 billion CDO portfolio and related assets from

the daily scrutiny of the Company's VAR model, asset stress testing and other internal risk

controls during the third quarter 2007 caused these assets to be impermissibly treated pursuant to

SFAS 157 Level 3 (management judgment and estimation), instead of required Level 2 standards

(valued on a mark-to-market basis). *Id.* at ¶¶ 10, 16, 97, 146(c).

---

[5] Should this Court, however, conclude that the SAC's allegations cross the line between
negligence and fraud, then Plaintiffs respectfully request an opportunity to re-plead it to conform
it to a negligence-based violation of the Securities Act. *Rombach v. Chang*, 355 F.3d 164, 176
(2d Cir. 2004) (directing the district court to allow the plaintiff an opportunity to file a motion to
"re-plead" the complaint based on violations of the Securities Act in terms of negligence rather
than dismiss it outright for failing to comply with Fed.R.Civ.Proc. 9(b)).

BAC's asset reclassification whether attributed to negligence or instigated by BAC's management to allow the Offerings to proceed, the unquestionable impact is a clear and unforwarned deviation from BAC's previous SEC filings, internal accounting procedures and risk control protocols. As stated above, these deviations resulted in BAC overvaluing its trading assets and overstating its Tier 1 capital and leverage ratios at year-end 2007.[6] SAC at ¶¶ 10, 15-16, 86-87, 95, 137-138; *see also Employees' Retirement System, supra*, 804 F.Supp.2d at 152-153 (defendants' alleged deviation from publicly-stated loan underwriting standards held actionable under the Securities Act); *In re Bear Stearns Companies, Inc. Sec., Deriv. and ERISA Litig.*, 763 F.Supp.2d 423, 488-489 (S.D.N.Y. 2011) (alleged inflation of asset values through misapplication of VAR model held actionable under Securities Act); *In re General Electric Co. Sec. Litig.*, No. 09-cv-1951, __ F.Supp.2d __, 2012 WL 90191, *34 (S.D.N.Y. Jan. 11, 2012) (allegation that defendant inflated value of loans listed in prospectus through improper asset reclassification held actionable under Securities Act).

The SAC alleges that, throughout the relevant period, BAC used VAR and asset stress testing to objectively "measure *and* manage" market risk inherent in its CDOs (and other structured products) as part of the Company's internal financial risk controls. SAC at ¶¶ 15, 78-82 (emphasis added). Numerous courts in this district recognize the materiality of VAR representations in SEC filings. *See, e.g., In re Sadia, S.A. Sec. Litig.*, 643 F.Supp.2d 521, 530-531 (S.D.N.Y. 2009) (bank's removal of currency hedging contracts from its VAR model held

---

[6] BAC's argument that the SAC merely alleges that BAC should have taken the same amount of CDO write downs at year-end 2007 that it actually did is incongruous with the SAC's allegations. *Compare*, BAC Opp. at pp. 17-18 and n.77, *with* SAC ¶¶ 10, 15 (removal of CDOs, HELs and related structured assets form VAR); ¶¶ 16, 85 (VAR asset removals resulted in a "failure to timely write down" $1.01 billion in HELSs and $4.5 billion in CDOs at year-end 2007); ¶¶ 137-138 (as a result, BAC "negligently failed to charge off (cumulatively)" $1.097 billion in HELs and "should have written down an additional $4.5 billion on the Bank's CDOs and related financial instruments") (emphasis added).

actionable under Securities Exchange Act); *In re Deutsche Bank AG Sec. Litig.*, No. 09-cv-1714, 2011 WL 3664407 (S.D.N.Y. Aug. 19, 2011) (allegation that bank's VAR model "failed to reflect the actual risk associated with ... equities trading" stated an actionable claim under the Securities Act); *In re Lehman Bros. Sec. and ERISA Litig.*, 799 F.Supp.2d 258, 286-287 (S.D.N.Y 2011) (allegation of undisclosed routine breaches in bank's VAR model rendered offering materials materially misleading under the Securities Act).

Here, the SAC provides further factual detail regarding BAC's failure to publicly disclose until after the January 2008 Series K Offering that all CDOs had been removed from the Bank's VAR model and asset stress testing in the third quarter 2007 due to their "illiquidity." SAC ¶¶ 83-86, 97.[7] Because CDO daily trading results were not tracked within VAR and/or the Bank's asset stress testing models, BAC's senior management was effectively shielded from the truth about BAC's actual CDO daily trading losses during the second half of 2007.[8] This, in turn, precluded the Company from effectively implementing its publicly-touted internal management risk controls that would have recognized an additional $4.5 billion in CDO write downs at year-end 2007. *See, e.g.*, SAC ¶¶ 15-16, 86-87, 95-97, 137-138.[9]

---

[7] BAC insinuates that the Company's third quarter 2007 Form 10-Q "may have" included CDOs its VAR model (BAC Opp. at p. 20). However, comparing the "Daily Trading-related Revenue and VAR" activity graph and accompanying text for that quarter, with the 2007 full-year VAR graph and text, reveals the identical trading loss activity for the third quarter 2007, *i.e.*, that the $26.2 billion CDO portfolio was, in fact, excluded from VAR and that the 10 daily trading losses exceeding VAR in the third quarter did not include CDO trading losses. *Compare*, BAC 3Q 2007 Form 10-Q at p. 123, *with* BAC 2007 Form 10-K at p. 64.

[8] During this time period, the ABX and TABX trading indicies provided BAC's management with sufficient trading price information to mark-to market BAC's SFAS 157 Level 2-rated CDO portfolio on a daily basis. *Stratte-McClure v. Morgan Stanley*, 784 F.Supp.2d 373, 381-382 (S.D.N.Y. 2011); *In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d 206, 241 (S.D.N.Y. 2010).

[9] BAC's undisclosed removal of CDOs from VAR and its other risk management controls, and de facto treatment of CDOs as SFAS 157 Level 3 assets, also rendered the Sarbanes-Oxley Act

7

Simply stated, had the CDOs remained in VAR and subject to the Bank's other risk management programs, senior management would have been notified of, reviewed and evaluated CDO trading deviations exceeding VAR limits on a daily basis, and timely implemented "proactive measures ... to adjust risk levels" – including the taking of appropriate CDO asset write downs required under GAAP/FASB.[10] SAC ¶¶ 87; *Cf., In re Lehman Bros. Sec. Litig.*, 684 F.Supp.2d 485, 493 (S.D.N.Y. 2010) (Kaplan, J.) (bank's omission of its departure from historic loan underwriting guidelines in offering documents held actionable under the Securities Act).

Defendants' citation to BAC's disclosure in its 3Q 2007 Form 10-Q that BAC had reclassified $3.258 billion in "*asset-backed securities issued*" by CDOs from SFAS 157 Level 2 to Level 3 (but not the CDOs themselves),[11] provides no meaningful analysis or insight into senior management's awareness of the Bank's CDO asset reclassification practices and the materiality of the SAC's allegation that BAC improperly failed to take an additional $4.5 billion in CDO write downs at year-end 2007 which, concomitantly, caused BAC to materially overstate its Tier 1 leverage ratio. BAC Opp. p. 19 (italics in original); *also compare*, SAC ¶¶ 95-97, 137-138 and BAC 3Q 2007 Form 10-Q at p. 35, *with In re Citigroup Inc. Bond Litig.*, 723 F.Supp.2d

---

Section 302 certifications executed by Defendants Lewis and Price and appended to BAC's third quarter 2007 Form 10-Q false and misleading because they did not disclose this material change in BAC's internal controls. SAC ¶¶ 83-97; 15 U.S.C. § 7241(a).

[10] Although Plaintiffs believe that the SAC alleges sufficient facts establishing that, "[i]n light of the above, the BAC Defendants did not actually believe BAC's public statements concerning asset write downs, charge-offs, internal accounting controls and reporting of BAC's Tier 1 capital and leverage ratios at year-end 2007 at the time they were made," Plaintiffs have appended as Ex. A to the Plavi Decl. a revised proposed SAC which adds the above allegation to SAC ¶ 97 to ensure compliance with Judge Kaplan's March 16, 2012 Order adopting the R&R and referring the instant Motion to Your Honor [Dkt. # 65 at p. 2],. *See also* footnote 14, *infra*.

[11] As recognized in *Litwin v. The Blackstone Group, L.P.*, 634 F.3d 706, 710 nn. 2-3 (2d Cir. 2011), because of their underlying structural differences, CDOs are treated differently from RMBSs and other ABS products for purposes of federal securities law.

586, 593-594 (S.D.N.Y. 2010) (holding that a bank's failure to correctly disclose its actual Tier 1 capital status in offering documents was material and, thus, actionable under the Securities Act).

Defendants' alternative argument that its VAR disclosures fall within the PSLRA's safe harbor protections as "forward looking statements" and/or under the "bespeaks caution" doctrine, misconstrues VAR's nature and function. BAC Opp. at pp. 21-23. BAC's VAR was an objectively-based, statistical model designed to evaluate risk in BAC's daily trading activities at a 99% confidence level as one component of the Company's internal risk controls. SAC ¶¶ 78-80. Statements concerning the VAR model and trading activity data reported in BAC's SEC filings were based on actual trading activity during the period reported rather than projected activity in future reporting periods. *See, e.g.*, BAC 3Q 2007 Form 10-Q at pp. 122-123, BAC 2007 Form 10-K at pp. 63-64. Thus, the information and data reported in BAC's SEC filings relating to the results of VAR was a presentation of current risk factors and actual daily trading activity rather than forward-looking predictions of future trading activity. *Ibid.*; *see also In re Bear Stearns, supra*, 763 F.Supp.2d at 492-493 (rejecting defendants' argument that VAR results reported in SEC filings were PSLRA-protected forward looking statements or otherwise covered by the bespeaks caution doctrine); *accord In re Lehman Bros., supra*, 799 F.Supp.2d at 283-285; *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004 ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim [them] with cautionary language").[12]

---

[12] The purported cautionary statements relied on by the BAC Defendants generalize potential impacts to "the business and economic environment" of any financial services company, and thus are insufficient to fall within the "bespeaks caution" doctrine, *i.e.*, they are too tenuous to offset Lewis' express representation that Countrywide's loan "originations in the current market are of much higher quality and better spreads than the past couple of years," when that was untrue at that time. SAC at ¶ 127-131; *In re Nortel Networks Corp. Sec. Litig.* 238 F.Supp.2d 613, 629 (S.D.N.Y. 2003) (where defendants "already knew" but did not disclose "that certain

## C. BAC'S POSITIVE PUBLIC STATEMENT ABOUT COUNTRYWIDE'S "CURRENT MARKET" LOAN ORIGINATIONS ARE ACTIONABLE

As this Court recognized in its R&R, BAC did make one "potentially actionable" oral communication of an "affirmative representation of then-existing fact – specifically, the quality of Countrywide's originations and their resulting spreads as of January 2008." R&R at pp. 65-66. This highly material statement was made by then-BAC CEO Kenneth D. Lewis ("Lewis") on January 11, 2008 that, "[t]he good news is much of [Countrywide's] originations in the current market are of much higher quality and better spreads than the past couple of years." R&R at pp. 65-66; *see also* SAC ¶¶ 127-131.[13] This statement, which the BAC Defendants do not contest was made by Lewis on behalf of BAC, is an affirmative misrepresentation of a then-existing fact. And although this Court previously concluded that Plaintiffs had not specifically alleged that Countrywide's loan originations in January 2008 "were either of the same or lower quality as compared to prior years" (R&R at p. 66), it did acknowledge that "the accuracy of offering documents must be assessed in light of the information available at the time of they were published." R&R at p. 26 (internal quotations and citations omitted).

In accordance with the R&R, the SAC provides additional specific allegations supporting the claim that Lewis' "good news" statement was, in fact, false or misleading, and not believed

risks had become reality, the misstatements do not fall under the PSLRA's safe harbor provisions").

[13] It is not how often that a defendant may utter a false oral communication statement that gives rise to a violation under 15 U.S.C. § 77l(a)(2), but rather the materiality of the communication itself when viewed by the "total mix" of information made available to a reasonable investor. *Litwin, supra,* 634 F.3d at 716-717. Here, the BAC Defendants offer no evidence to suggest that a reasonable investor could have discerned from any other publicly available source that Countrywide's "current market" loan originations at year-end 2007 were not "of much higher quality and better spreads" as represented by Lewis prior to, at a minimum, BAC's release of its combined 2008 results of operations with Countrywide on January 16, 2009.

by BAC/Lewis when publicly stated due to BAC's pre-acquisition due diligence.[14] *Compare*,

R&R at pp. 65-68, *with* SAC ¶¶ 126-131 and Ex. A thereto; *accord Fait v. Regions Financial*

*Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). Specifically, Countrywide loan origination data

provided to the Financial Crisis Inquiry Commission ("FCIC") by BAC (and first made public in

2011) but previously known (internally) to BAC due to its 2007 Countrywide due diligence,

reveals that company-wide loan originations had not materially improved. *See* SAC ¶¶ 121, 127-

131 and Ex. A thereto. The BAC Defendants do not contest the authenticity of this document

which belies the accuracy of Lewis' January 11, 2008 statement.[15] *In re Barclays Bank PLC*

*Sec. Litig.*, No. 09-cv-1989, 2011 WL 31548, *5 (S.D.N.Y. Jan. 5, 2011) ("the accuracy of

offering documents must be assessed in light of the information available at the time they were

published") (internal citations and quotations omitted).

    Indeed, as detailed in Ex. A to the SAC, the data BAC provided to the FCIC regarding

---

[14] As with footnote 10, above, the SAC alleges sufficient facts to establish that defendants did not honestly believe the accuracy of Lewis' statement regarding Countrywide's "current market" loan originations when publically made on January 11, 2008 because Lewis' statement was an affirmative representation of then-existing fact. R&R, at p. 66. Nonetheless, to satisfy the BAC Defendant's "belt and suspenders" pleading demand, Plaintiffs' revised proposed SAC adds the allegation, "and neither Lewis nor the other BAC Defendants actually believed Lewis' public statement at the time it was made" at the end of SAC ¶ 131.Plavi Decl, Ex. A.

[15] The BAC Defendants attempt to rehabilitate the accuracy of Lewis' statement by drawing comparisons from Countrywide's 2007 FICO scores and weighted loan-to-value ratios to those dating back to 2003. BAC Opp. at p. 13. However, Lewis's statement regarding increased loan origination quality was based on the "current market" (*i.e.*, as of year-end 2007) verses loans originated in the "past couple of years" (*i.e.*, 2005-2006; although 2004's loan originations were nearly identical to 2005's). Thus, Defendants' interjection of Countrywide's 2003 loan origination data into Lewis' statement is nothing more than a disingenuous attempt to compare apples to oranges. *Cf.*, *Litwin*, *supra*, 634 F.3d at 719 ("Blackstone is not permitted, in assessing materiality, to aggregate negative and positive effects … in order to avoid disclosure of a particular negative effect.")

Countrywide's quarter by quarter loan originations from 2003-2007 reflects, *inter alia*:[16]

- Countrywide loan originations were substantially similar throughout 2007 to those in prior years and, in certain instances, were worse in the fourth quarter of 2007;

- FICO scores on Countrywide originations in 2007 were similar to those in 2004-2006: ranging from a weighted average FICO score of 705 (in the first quarter of 2004), to a weighted average score of 703 (in the first quarter 2007), and 706 (in the second and third quarters of 2007), to 712 (in the fourth quarter 2007);[17]

- Combined loan-to-value ratios ("CLTV") for Countrywide originations in the fourth quarter of 2007 were substantially similar to years 2004-2006. The weighted average CLTV on all Countrywide originations in the fourth quarter 2007 was 79% (and 79-80% in the first through third quarters of 2007), while the CLTV for Countrywide originations for years 2004-2006 were virtually identical, having CLTV weighted averages of 79-81%;

- Countrywide originations in the fourth quarter 2007 with greater than 85%, 90% and 100% CLTV, comprised approximately 43% of all originations in that quarter. In comparison, the same CLTVs in the fourth quarters 2005 and 2006 comprised, roughly, 44% of all originations in those quarters; and,

- Countrywide originations in the fourth quarter 2007 with greater than 100% CLTV increased by approximately 40% from the fourth quarter 2005, and approximately 28% from the fourth quarter 2006.

The post-Class Period data concerning Countrywide's 2003-2007 loan originations that

BAC "confidentially" submitted to the FCIC in 2010 was information internally known to

BAC's senior management prior to Defendant Lewis' January 11, 2008, "good news" public

statements regarding Countrywide's "current market" loan originations. *In re Scholastic Corp.*

*Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (acknowledging that a plaintiff may rely upon post-

class period data released by defendants to plead a claim for securities fraud); *In re Vivendi*

---

[16] *See* SAC, at ¶¶ 126-131, and Ex. A thereto.

[17] BAC Defendants' passing reference in their Opposition that there was a 6 point increase in average FICO scores (706 to 712) in Countrywide loan originations between the third and fourth quarter 2007 hardly validates Lewis' statement (BAC Opp. at pp. 13-14) that originations in the "past couple of years" were of a much higher quality, as a matter of law. *Stratte-McClure*, *supra*, 784 F.Supp.2d at 388 (factual dispute over interpretation of historical trading data cannot be resolved on a motion to dismiss); *In re Citigroup*, 753 F.Supp.2d at 235 n.5 (same).

12

*Universal, S.A. Sec. Litig.*, No. 02-cv-5571, 2004 WL 876050, \*6 (S.D.N.Y. April 22, 2004) (same).

The BAC Defendants' interpretation and presentation of the FCIC data is not to the contrary. It only shows that by January 11, 2008 the number of originations for two discrete types of Countrywide loans (Alt-A and Pay-Option loans) like all other loan types had decreased. But that does not validate Lewis' representation that 2007 originations were of "higher quality" than their predecessors, and the FCIC data appended to the SAC reflects that Countrywide's loan originations had not qualitatively changed from earlier reported periods; they had only quantitatively decreased. SAC, Ex. A; *see also Litwin*, *supra*.

For example, Alt-A and Pay-Option loans comprised a mere 0.24% and 3.36%, respectively, of all Countrywide loans originations in the fourth quarter 2007. *See* Plavi Decl., ¶¶ 15-17. Even if combined, the origination quality of these two types of fringe loans is dwarfed when compared to the 96.4% of all other Countrywide loans originated during this same period. Thus, Lewis' "good news" statement was clearly inaccurate and inconsistent with Countrywide then-current loan originations, and the BAC Defendants' argument that loan originations had become "less risky" or were an "improvement" over prior years is, at best, a factual dispute indeterminable at this stage. BAC Def. Opp., at pp.12-13; *Stratte-McClure*, *supra*.

Additionally, the BAC Defendants' self-serving "interpretation" of the FCIC data does not render the SAC's allegations as a case having been pled by "fraud in hindsight." *In re Vivendi Universal*, *supra*, 2004 WL 876050, at \*6 ("plaintiffs may rely on post-class period data to confirm what a defendant should have known during the class period"); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 (C.D. Cal. 2008) (rejecting this very argument, "[i]t is not the Court's role to speculate on the causes of the current economic

13

situation"); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F.Supp.2d 1142, 1161 n.7 (S.D. Cal. 2008) (refusing to consider extraneous materials and summary of industry events as unnecessary and inappropriate on a motion to dismiss); *In re RAIT Financial Trust Sec. Litig.*, No. 07-cv-3148, 2008 WL 5378164, \*5, 7 (E.D. Pa. Dec. 22, 2008) (rejecting "fraud by hindsight" defense where company failed to disclose its subprime exposure, properly value the assets collateralizing its CDOs, and account for loss reserves); *see also In re New Century*, 588 F.Supp.2d 1206, 1230 (C.D. Cal. 2008) (rejecting hindsight argument where lender "[told] the public one thing when [it] was doing something quite different – the loans were of poor, not great, quality; the underwriting was all but absent").

## D. PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

Defendants, again, raise a nebulous claim that "legions of complaints and reports dating back to 2007" pertaining to the mortgage underwriting practices of Countrywide (or lack thereof) render Plaintiffs' claims regarding BAC's CDO write downs and/or its misrepresentation of its Tier 1 capital and leverage ratios time-barred. *See* BAC Opp. at p. 2. However, these "complaints and records" involve Countrywide's loan originations in 2003-2005 rather than in the 2007 "current market." *Id.*

Further, neither the BAC Defendants nor the Underwriter Defendants cite, acknowledge, or otherwise address any specifics of these "complaints and reports" as they relate to the claims asserted in the SAC, or the new statute of limitations "discovery rule" set forth by the U.S. Supreme Court in *Merck & Co. v. Reynolds*, __ U.S. __, 130 S.Ct. 1784 (2010) ("*Merck*"). That standard was adopted by the Second Circuit Court of Appeals in *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011), and has since been applied to Securities Act §§ 11 and 12(a)(2) claims by numerous New York district courts (after

14

their thoughtful consideration of the underlying issues and principles). *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, *supra*, 753 F.Supp.2d at 371 n.39 (Sullivan, J.) (the "discovery" rule enunciated in *City of Pontiac* encompasses claims under the Securities Act); *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, No. 08-cv-5093, 2011 WL 2020260, *4 (S.D.N.Y. May 19, 2011) (Baer, J) (same); *Brecher v. Citigroup Inc.*, no. 09-cv-7359, 2011 WL 5525353, *4 n.1 (S.D.N.Y. Nov. 14, 2011) (Stein, J.) (the statute of limitations under the Securities Exchange Act of 1934 is consistent with that under the Securities Act, thus warranting application of the new discovery rule announced in *Merck/City of Pontiac*); *Plumbers' & Pipefitters' Local # 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corporation I*, No. 08-cv-1713, 2012 WL 601448, *10-11 and n.11 (E.D.N.Y. Feb. 23, 2012) (Korman, J.) (applying *Merck/City of Pontiac* to Securities Act §§ 11 and 12(a)(2) claims, finding no material difference in applicable statute of limitations between the two securities acts); *In re Direxion Shares ETF Trust*, No. 09-cv-80911, 2012 WL 717967, *2 n.3 (S.D.N.Y. Mar. 6, 2012) (Forrest, J.) (same); *see also In re Bear Stearns Mortgage Pass-Through Cert. Litig.*, No. 08-cv-8093, ___ F.Supp.2d ___, 2012 WL 1076216, *12-13 (S.D.N.Y. Mar. 30, 2012) (Swain, J.) ("Plaintiffs cannot be charged with knowledge of every lawsuit filed against an [MBS] originator"), *citing Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 418 (2d Cir. 2008).

More importantly, given the positive affirmative representation by Lewis following BAC's due diligence, a reasonable investor would likely have concluded that Countrywide had been able to put its troubled past behind it. In actuality, such was not the case. While the truth of CDO write downs began to be publicly revealed following BAC's January 16, 2009 announcement of the combined results of BAC/Countrywide operations, there was no

15

corresponding disclosure as to the CDO originator (BAC vs. Countrywide) to enable a reasonable investor to ascertain that BAC had over-valued its CDO portfolio at year-end 2007.

"[D]efendants bear a heavy burden in establishing" that the statute of limitations has been triggered. *Lentell v. Merill Lynch & Co. Inc.*, 396 F.3d 161, 168-169 (2d Cir. 2005) ("whether a plaintiff had sufficient facts to [trigger the limitations period] is 'often inappropriate for resolution on a motion to dismiss'"). Indeed, under *Merck* and its progeny the statute of limitations under the Securities Act does not start until "a reasonably diligent plaintiff would have discovered facts constituting the violation." *Merck*, 130 S.Ct. at 1798; *City of Pontiac*, 637 F.3d at 175 (a "fact" is not deemed discovered until "a plaintiff would have sufficient information about that fact to adequately plead it in a complaint … with sufficient detail and particularity to survive a [Fed.R.Civ.Proc.] 12(b)(6) motion to dismiss").

Here, the "facts" publicly available to Plaintiffs for statute of limitations "discovery" purposes do not reach the level cognizable under the *Merck*/*City of Pontiac* threshold until January 16, 2009, when BAC issued a press release reporting its fourth quarter and full year 2008 financial results. SAC ¶¶ 18, 155. Prior to that date, BAC had never publicly reported the results of the combined operations of Countrywide and BAC.[18] And Plaintiff Montgomery's original complaint, which raised these very same claims, was filed within one year following BAC's press release. [Dkt # 1 at ¶¶ 7, 59-60].

Thus, the FAC and SAC never raised "new claims" relating to the CDO asset reclassification/over-valuation and misreported BAC's capital and leverage Tier 1 ratios (they had been pled in the original complaint). *Compare*, Dkt # 1, at ¶¶ 7, 59-60, *with* FAC [Dkt #

---

[18] In the January 16, 2009 press release, BAC acknowledged – for the first time – the necessity of billions of dollars in write downs and net-charge offs for problematic CDOs, MBSs, and loans and leases due the combining of Countrywide's operations with those of BAC, and also increased provisions for future asset write downs, losses and reserves. SAC ¶¶ 155-157.

25], at ¶¶ 3-4, 7, 13, 74, 98, 101, 103, and SAC at ¶¶ 4-5, 10-11, 15-16, 71-77, 83-93, 95-96,

146, 148. Rather, the amended pleadings merely provided more definite and precise allegations

regarding the same underlying claims, and their filing "relates back" to the date of the original

complaint under Fed.R.Civ.Proc. 15(c). *See, e.g., In re Noah Educational Holdings, Ltd. Sec.*

*Litig.,* No. 08 Civ. 9203, 2010 WL 1372709, \*9–10 (S.D.N.Y. Mar.31, 2010) (when an amended

pleading relates back to an earlier pleading, it will be deemed to have been filed on the date of

the earlier pleading); *accord Schiavone v. Fortune,* 477 U.S. 21, 30-31 (1986); *Bridgeway Corp.*

*v. Citibank, N.A.,* 132 F.Supp.2d 297, 301 (S.D.N.Y.2001).

Likewise, under the *Merck/City of Pontiac* line of authority, while the allegations

regarding Lewis' misrepresentation of the quality and spreads of Countrywide's loan

originations in the "current market" was first made in the FAC, it was a claim that nonetheless

was asserted within the Securities Act's three (3) year statute of repose. 15 U.S.C. § 77m; *P.*

*Stolz Family Partnership, supra,* 355 F.3d at 102-103. Defendants do not dispute that data

relating to Countrywide's 2007 loan originations was not publicly available until February 13,

2011 when the FCIC publicly released the information (the data having been previously provided

to the FCIC by BAC with the request that it be given "confidential treatment"). SAC, Ex. A.

Under *Merck/City of Pontiac* (as since refined by New York's district courts), Plaintiffs could

not have had "sufficient information about that fact to adequately plead it in a complaint" until

this data was released by the FCIC. *City of Pontiac, supra,* 637 F.3d at 175; *accord Plumbers' &*

*Pipefitters' Local # 562, supra,* 2012 WL 601448, at \*10-11. As a result, the statute of

limitations on this claim did not commence until February 13, 2011.

Accordingly, since the claim relating to Lewis' misrepresentation of the quality of

Countrywide's "current market" loan originations was first pled in the FAC – which defendants

17

admit was filed within the statue of repose and within days of the FCIC's release of BAC's "confidential" data regarding these loan originations – Plaintiffs' § 12(a)(2) claim based on an "oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading," is also not time-barred.

## III.   CONCLUSION

For reasons stated herein, Plaintiffs' motion for leave to file the proposed SAC should be granted.

Dated: May 18, 2012                          Respectfully submitted,

**FINKELSTEIN & KRINSK LLP**

By:    /s/  Jeffrey R. Krinsk
Jeffrey R. Krinsk (Admitted Pro Hac Vice)
Mark L. Knutson (Admitted Pro Hac Vice)
C. Michael Plavi II (Admitted Pro Hac Vice)
501 West Broadway, Suite 1250
San Diego, CA 92101
Tel: 619.238.1333

Attorneys for Plaintiffs and Lead Counsel
for the Class

**KLAFTER, OLSEN & LESSER LLP**
Jeffrey Klafter
Two International Place, Suite 350
Rye Brook, NY 10573
Tel: 914.934.9200

Attorneys for Plaintiffs and Liaison Counsel
for the Class

18