UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NECA-IBEW PENSION TRUST FUND and DENIS MONTGOMERY, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>Defendants. | ) Case No. 10-cv-00440 (LAK) (HBP)<br>)<br>)<br>) <u>CLASS ACTION</u><br>)<br>)<br>) ECF CASE<br>)<br>)<br>)<br>)<br>) |

# NOTICE OF RECENT AUTHORITY

Lead Plaintiff investor NECA-IBEW Pension Trust Fund and individual plaintiff investor Denis Montgomery (jointly, "Plaintiffs"), respectfully submit this Notice of Recent Authority in support of their motion for leave to file the Second Amended Class Action Complaint ("SAC"), now pending before this Court. Dkt. # 61-63, 71-72.

On May 25, 2012, the United States Court of Appeals for the Second Circuit, issued its opinion in *Panther Partners, Inc. v. Ikanos Communications, Inc.*, ("*Panther Partners*"), __ F.3d __, 2012 WL 1889622 (2d. Cir., May 25, 2012), reversing the district court's order denying plaintiff leave to amend in order to file an amended complaint alleging violations of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act Claims"). A copy of the opinion is attached hereto as Exhibit A. The logic adopted provides instruction seemingly dispositive of Plaintiff's pending motion.

Specifically, the Second Circuit Court of Appeals held that the proposed amended complaint stated suitable Securities Act Claims by alleging Defendant's general knowledge of a known trend or uncertainty (as pled by SAC) that the Company should have reasonably expected to have a material impact on company financials (as similarly pled by the SAC). *Panther Partners*, 2012 WL 1889622, at *1, 5-6. The Court explained that it was not the uncertainty of Defendant's ability to quantify the impact of the adverse trend that entailed the potential liability but, rather, the Defendant's failure to disclose that the problem would negatively impact the company's financial performance were it to materialize. *Id*, at *5-6, discussing Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 708 (2d Cir. 2011) (explaining "plaintiffs are not seeking the disclosure of the ... downward trend in the real estate market.... Rather, plaintiffs claim that Blackstone was required to disclose the manner in which th[at] then-known trend[ ], event[ ], or uncertaint[y] might reasonably be expected to materially impact Blackstone's future revenues.")

1

The findings of *Panther Partners* directly support Plaintiff's position and are particularly instructive to Plaintiffs' arguments in their motion for leave to file the SAC regarding Bank of America's material omissions as alleged in the SAC.

Dated: June 1, 2012

Respectfully submitted,

**FINKELSTEIN & KRINSK LLP**

By:  /s/  Jeffrey R. Krinsk
Jeffrey R. Krinsk (Admitted Pro Hac Vice)
Mark L. Knutson (Admitted Pro Hac Vice)
C. Michael Plavi II (Admitted Pro Hac Vice)
501 West Broadway, Suite 1250
San Diego, CA 92101
Tel: 619.238.1333

Attorneys for Plaintiffs and Lead Counsel for the Class

**KLAFTER, OLSEN & LESSER LLP**
Jeffrey Klafter
Two International Place, Suite 350
Rye Brook, NY 10573
Tel: 914.934.9200

Attorneys for Plaintiffs and Liaison Counsel for the Class

# EXHIBIT A

Westlaw.

Page 1

--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 1889622 (C.A.2 (N.Y.)))**

**H**
Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
PANTHER PARTNERS INC., on Behalf of Itself and
All Others Similarly Situated, Plaintiff–Appellant,
v.
IKANOS COMMUNICATIONS, INC., Rajesh
Vashist, Daniel K. Atler, Danial Faizullabhoy, Michael L. Goguen, Michael Gulett, Paul G. Hansen,
Gopal Venkatesh, Citigroup Global Markets Inc.,
Defendants–Appellees,
Lehman Brothers Inc., Defendant.[FN*]

Docket No. 11–63–cv.
Argued: April 17, 2012.
Decided: May 25, 2012.

**Background:** In securities fraud class action alleging that disclosures in semiconductor company's offering statements for initial public offering (IPO) and secondary offering were inadequate, the United States District Court for the Southern District of New York, Paul A. Crotty, J., dismissed complaint for failure to state a claim, 538 F.Supp.2d 662, denied plaintiffs leave to amend, and denied motion for reconsideration of that denial, 2008 WL 2414047. After appeal and remand, at 347 Fed.Appx. 617, plaintiff again appealed dismissal.

**Holding:** The Court of Appeals, Barrington D. Parker, Circuit Judge, held that complaint stated claim for inadequate disclosures in registration statement and prospectus.

Vacated and remanded with instructions to grant leave to amend.

West Headnotes

[1] Federal Courts 170B ⚷776

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most Cited Cases

**Federal Courts 170B ⚷817**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)4 Discretion of Lower Court
            170Bk817 k. Parties; Pleading. Most Cited Cases

Court of Appeals reviews a district court's denial of leave to amend for abuse of discretion, unless denial was based on an interpretation of law, such as futility, in which case court reviews the legal conclusion de novo.

**[2] Federal Civil Procedure 170A ⚷851**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases

"Futility" is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies in complaint or to state a claim.

**[3] Federal Civil Procedure 170A ⚷1772**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)3 Pleading, Defects In, in General
            170Ak1772 k. Insufficiency in General. Most Cited Cases

**Federal Civil Procedure 170A ⚷1829**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))
(Cite as: 2012 WL 1889622 (C.A.2 (N.Y.)))

170Ak1827 Determination
170Ak1829 k. Construction of Pleadings. Most Cited Cases

**Federal Civil Procedure 170A ⇌1835**

170A Federal Civil Procedure
　170AXI Dismissal
　　170AXI(B) Involuntary Dismissal
　　　170AXI(B)5 Proceedings
　　　　170Ak1827 Determination
　　　　　170Ak1835 k. Matters Deemed Admitted; Acceptance as True of Allegations in Complaint. Most Cited Cases

**Federal Civil Procedure 170A ⇌1838**

170A Federal Civil Procedure
　170AXI Dismissal
　　170AXI(B) Involuntary Dismissal
　　　170AXI(B)5 Proceedings
　　　　170Ak1837 Effect
　　　　　170Ak1838 k. Pleading Over. Most Cited Cases

In assessing whether a proposed complaint states a claim, following dismissal of original complaint, court considers the proposed amendments along with the remainder of original complaint, accepts as true all non-conclusory factual allegations therein, and draws all reasonable inferences in plaintiff's favor to determine whether the allegations plausibly give rise to an entitlement to relief.

[4] **Federal Civil Procedure 170A ⇌636**

170A Federal Civil Procedure
　170AVII Pleadings and Motions
　　170AVII(A) Pleadings in General
　　　170Ak633 Certainty, Definiteness and Particularity
　　　　170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

**Securities Regulation 349B ⇌25.21(1)**

349B Securities Regulation
　349BI Federal Regulation
　　349BI(B) Registration and Distribution
　　　349BI(B)4 Registration Statements
　　　　349Bk25.17 False Statements or Omissions; Accuracy
　　　　　349Bk25.21 Grounds of and Defenses to Liability
　　　　　　349Bk25.21(1) k. In General. Most Cited Cases

**Securities Regulation 349B ⇌25.25**

349B Securities Regulation
　349BI Federal Regulation
　　349BI(B) Registration and Distribution
　　　349BI(B)4 Registration Statements
　　　　349Bk25.25 k. Pleading. Most Cited Cases

**Securities Regulation 349B ⇌25.62(1)**

349B Securities Regulation
　349BI Federal Regulation
　　349BI(B) Registration and Distribution
　　　349BI(B)5 Prospectuses and Communications
　　　　349Bk25.55 False Statements or Omissions; Accuracy
　　　　　349Bk25.62 Grounds of and Defenses to Liability
　　　　　　349Bk25.62(1) k. In General. Most Cited Cases

**Securities Regulation 349B ⇌25.65**

349B Securities Regulation
　349BI Federal Regulation
　　349BI(B) Registration and Distribution
　　　349BI(B)5 Prospectuses and Communications
　　　　349Bk25.65 k. Pleading. Most Cited Cases

Neither scienter, reliance, nor loss causation is an element of claim for false or misleading registration statement or prospectus under Securities Act, which, unless they are premised on allegations of fraud, need not satisfy heightened particularity requirements of federal rule pertaining to fraud. Securities Act of 1933, §§ 11(a), 12(a)(2), 15 U.S.C.A. §§ 77k(a), 77l(a)(2); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

[5] **Securities Regulation 349B ⇌25.18**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 1889622 (C.A.2 (N.Y.)))**

349B Securities Regulation
    349BI Federal Regulation
        349BI(B) Registration and Distribution
            349BI(B)4 Registration Statements
                349Bk25.17 False Statements or Omissions; Accuracy
                    349Bk25.18 k. In General. Most Cited Cases

**Securities Regulation 349B ⟜25.57**

349B Securities Regulation
    349BI Federal Regulation
        349BI(B) Registration and Distribution
            349BI(B)5 Prospectuses and Communications
                349Bk25.55 False Statements or Omissions; Accuracy
                    349Bk25.57 k. Particular Prospectuses or Communications. Most Cited Cases

Investors stated claim against programmable semiconductor company for violations of Securities Act relating to registration statement and prospectus in connection with initial public offering (IPO) by alleging presently existing trend or uncertainty in company's very-high-bit-rate digital subscriber line (VDSL) chips, and that company was required to disclose defects in chips, since company reasonably expected that the known defects would have a material unfavorable impact on its revenues, income, and relationships with major customers. Securities Act of 1933, §§ 11(a), 12(a)(2), 15, 15 U.S.C.A. §§ 77k(a), 77l(a)(2), 77o; 17 C.F.R. § 229.303(a).

**[6] Securities Regulation 349B ⟜25.18**

349B Securities Regulation
    349BI Federal Regulation
        349BI(B) Registration and Distribution
            349BI(B)4 Registration Statements
                349Bk25.17 False Statements or Omissions; Accuracy
                    349Bk25.18 k. In General. Most Cited Cases

**Securities Regulation 349B ⟜25.56**

349B Securities Regulation
    349BI Federal Regulation
        349BI(B) Registration and Distribution
            349BI(B)5 Prospectuses and Communications
                349Bk25.55 False Statements or Omissions; Accuracy
                    349Bk25.56 k. In General. Most Cited Cases

Disclosure obligations under Securities and Exchange Commission (SEC) regulation requiring company to include in its SEC filings a discussion of any known trends or uncertainties that registrant reasonably expects will have a material impact on net sales, revenues, or income do not turn on restrictive mechanical or quantitative inquiries. 17 C.F.R. § 229.303(a).

Appeal from an order of the United States District Court for the Southern District of New York (Crotty, J.) denying plaintiff leave to amend its complaint alleging violations of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933, on the ground that plaintiff's proposed complaint failed to state a claim. See 15 U.S.C. §§ 77k, 77l(a)(2), 77o. That complaint alleged that defendants were required to disclose, in connection with Ikanos Communications Inc.'s secondary securities offering, known defects in the company's semiconductor chips. We hold that, because it plausibly alleged that the known defects constituted a known trend or uncertainty that defendants reasonably expected would have a material unfavorable impact on revenues, see Item 303 of SEC Regulation S–K, 17 C.F.R. § 229.303(a)(3)(ii), the proposed complaint stated a claim under §§ 11, 12(a)(2), and 15. Susan K. Alexander, Robbins Geller Rudman & Dowd LLP, San Francisco, CA (Sanford Svetcov, Robins Geller Rudman & Dowd LLP, San Francisco, CA, Samuel H. Rudman, David A. Rosenfeld, Robins Geller Rudman & Dowd LLP, Melville, NY, on the briefs), for Plaintiff–Appellant.

James N. Kramer (Michael D. Torpey, on the brief), Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, for Defendants–Appellees Ikanos Communications, Inc., Rajesh Vashist, Daniel K. Atler, Danial Faizullabhoy, Michael L. Goguen, Michael Gulett, Paul G. Hansen and Gopal Venkatesh.

Daniel J. Toal (Daniel J. Kramer, Farrah R. Berse, Aaron H. Crowell, on the brief), Paul, Weiss, Rifkind,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 1889622 (C.A.2 (N.Y.)))**

Wharton & Garrison LLP, New York, NY, for Defendant–Appellee Citigroup Global Markets Inc.

Before JACOBS, Chief Judge, B.D. PARKER and HALL, Circuit Judges.

BARRINGTON D. PARKER, Circuit Judge:

*1 Plaintiff Panther Partners Inc. ("Panther") appeals an order of the United States District Court for the Southern District of New York (Crotty, J.), denying leave to amend its complaint alleging violations of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933. See 15 U.S.C. §§ 77k, 77l (a)(2), 77o. The proposed complaint alleged that defendant Ikanos Communications Inc. ("Ikanos" or the "Company") was required to disclose, and failed adequately to disclose, in connection with a March 2006 secondary offering of its securities (the "Secondary Offering"), known defects in the Company's semiconductor chips. We hold that the proposed complaint stated a claim because it plausibly alleged that the defects constituted a known trend or uncertainty that the Company reasonably expected would have a material unfavorable impact on revenues. See Item 303 of SEC Regulation S–K, 17 C.F.R. § 229 .303(a)(3)(ii). Accordingly, we vacate the judgment of the district court and remand with instructions to permit the filing of the amended complaint.

## BACKGROUND[FN1]

In this putative securities class action, Panther alleges that Ikanos and various of its officers, directors, and underwriters violated §§ 11, 12(a)(2), and 15 of the Securities Act by failing to disclose known defects in the Company's VDSL (very-high-bit-rate digital subscriber line) Version Four chips. Ikanos is a publicly-traded company that develops and markets programmable semiconductors. The semiconductors enable fiber-fast broadband services over telephone companies' existing copper lines. Ikanos's customers are primarily large original equipment manufacturers ("OEMs") in the communications industry that incorporate Ikanos's products into their products, which are then sold to telecommunications carriers. All of Ikanos's revenues derive from the sale of semiconductor chip sets.

In 2005, Ikanos sold its VDSL Version Four chips to Sumitomo Electric and NEC, its two largest customers and the source of 72% of its 2005 revenues. Sumitomo Electric and NEC then incorporated the chips into products that were in turn sold to NTT and installed in NTT's network.

Ikanos learned in January 2006 that there were quality issues with the chips. In particular, the chips had developed a problem called "Kirkendahl voiding," [FN2] traceable to a third-party assembling company in China to which Ikanos had switched the majority of its assembly work during the third and fourth quarters of fiscal year 2005. In the weeks leading up to the Secondary Offering, the defect issues became more pronounced as Ikanos received an increasing number of complaints from Sumitomo Electric and NEC. The thrust of the complaints was that the chips that had been installed in the NTT network were defective and were causing the network to fail, and that end-users who had subscribed to NTT's television, Internet and telephone services were losing signals and access to their subscribed services. According to Ikanos's former Director of Quality and Reliability, the defects "were a substantial problem for [Ikanos] to resolve in order to appease Sumitomo Electric and NEC and to retain them as customers," in part because Ikanos knew it would be unable to determine which of the chip sets it sold to these customers actually contained defective chips. J.A. at 52. Panther alleges that Ikanos's Board of Directors met and discussed the defect issue at the time it arose, and Company representatives regularly traveled to Japan to meet with Sumitomo and NEC representatives to evaluate the problem and to discuss possible solutions.

*2 Panther goes on to allege that Ikanos did not disclose the magnitude of the defect issue in either the Registration Statement or the Prospectus for the Secondary Offering. Instead, the Registration Statement simply cautioned in generalized terms that

[h]ighly complex products such as those that [Ikanos] offer[s] frequently contain defects and bugs, particularly when they are first introduced or as new versions are released. In the past we have experienced, and may in the future experience, defects and bugs in our products. If any of our products contains defects or bugs, or have reliability, quality or compatibility problems, our reputation may be damaged and our OEM customers may be reluctant to buy our products, which could harm our ability to retain existing customers and attract new customers. In addition, these defects or bugs could interrupt or delay sales or shipment of our products to our cus-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 1889622 (C.A.2 (N.Y.)))**

tomers.

*Id.* at 54–55, 168.

Some 5.75 million shares of Ikanos stock were sold in the Secondary Offering at $20.75 per share, raising more than $120 million. The individual defendants sold stock valued at $7.3 million.

Ikanos ultimately determined that the chips had an "extremely high" failure rate of 25–30%. *Id.* at 53. In June 2006, three months after the Secondary Offering, the Company reached an agreement with Sumitomo Electric and NEC to replace at Ikanos's expense all of the units sold—not just the units containing observably defective chips. This recall resulted in the return of hundreds of thousands of chip sets whose cost had to be written off.

In July 2006, the Company reported a net loss of $2.2 million for the second quarter, causing the price of its shares to drop over 25% from $13.85 to $10.24. Three months later, in October 2006, it reduced its expected third-quarter revenues from $40–$43 million to $36–37 million, citing "product delays and manufacturing constraints" involving its fourth-and fifth-generation chip sets. *Id.* at 56. The share price dropped almost 30%, from $10.94 to $7.76, on the news, and analysts lowered their fourth-quarter revenue projections from $45 million to $25 million. Three weeks later, Chief Executive Officer and Board Chairman Rajesh Vashist resigned. Two days later, Ikanos announced third-quarter revenues of $36.7 million and revised revenue estimates for the fourth quarter down further to $21–24 million. Shortly thereafter, plaintiff filed its initial complaint, alleging, among other things, that in contravention of Item 303 of SEC Regulation S–K, defendants failed to disclose the "known ... uncertaint[y]" that the VDSL Version Four chips were defective and were causing system failures where they were deployed. *See* 17 C.F.R. § 229.303(a)(3)(ii).

The operative complaint on this appeal, from which the facts above are drawn, is the third to have been considered by the district court in this case. The First Amended Complaint ("1AC") alleged merely that Ikanos learned in January 2006 that its VDSL Version Four chips were failing and causing NTT's customers to lose access to their subscribed services; that, some time later, Ikanos was forced to ship replacement products to Sumitomo Electric and NEC at Ikanos's expense; and that, at some point, Ikanos determined that the chips had a failure rate of 25–30%. The district court dismissed the 1AC for failure to state a claim, concluding that "[n]o plausibly pleaded fact suggests that Ikanos knew or should have known of the scope or magnitude of the defect problem at the time of the Secondary Offering." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,* 538 F.Supp.2d 662, 673 (S.D.N.Y.2008) ("*Panther Partners I* ").

**\*3** Panther moved for reconsideration, providing the court with a proposed amended complaint (the "First Proposed Second Amended Complaint" or "1PSAC"). The 1PSAC added allegations that the defect issue was becoming "more pronounced" in the weeks leading up to the Secondary Offering, when Ikanos was receiving "an increasing number of calls" from Sumitomo Electric and NEC; that the defect problems were "a substantial problem" for the Company to resolve; and that the Board of Directors was discussing the issue at the time it arose. 1PSAC at 7, 8. The district court denied the motion for reconsideration and for leave to replead, reasoning that plaintiff's filing of the 1PSAC would be futile because its new "vague" allegations were—like the 1AC's allegations—

> "silent about the rate at which chips were being returned ... or the volume of the defect [in the weeks leading up to the Secondary Offering].... Nor do the allegations specify that Ikanos knew exactly what the particular defect was at that time. It is no secret that chips are subject to some percentage of failure (and here there is no pleading as to what a 'normal' defect rate is), so the allegation that 'there were defects' is meaningless without more.... The [p]laintiff must tell the Court what was going on when—and how much the defect experienced actually differed from the norm."

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,* No. 06 Civ. 12967, 2008 WL 2414047, at \*3 (S.D.N.Y. June 12, 2008) ("*Panther Partners II* ") (quoting *Panther Partners I,* 538 F.Supp.2d at 673). The court reiterated its view that no plausibly pleaded fact suggested that Ikanos knew or should have known the magnitude of the defect problem at the time of the Secondary Offering.

Ikanos appealed both decisions. By summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 1889622 (C.A.2 (N.Y.)))**

order, we first affirmed the district court's dismissal of Panther's 1AC. We further held that, while the 1PSAC's new allegations "nudged plaintiff's claims closer to the line from conceivable to plausible, they were not enough to push the proposed second amended complaint across that line." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.,* 347 F. App'x 617, 621 (2d Cir.2009) ("*Panther Partners II*") (quotation marks and brackets omitted). Specifically, we held, the 1PSAC "failed to allege plausibly that [Ikanos] knew of abnormally high and potentially problematic defect rates before Ikanos published the registration statement," and therefore failed to state a claim. *Id.* at 622. Notwithstanding this holding, we vacated the district court's judgment denying Panther's motion for reconsideration and for leave to replead for futility because "it seems to us possible that [Panther] could allege additional facts that Ikanos knew the defect rate was above average before filing the registration statement." *Id.* We urged the court on remand to "consider all possible amendments"—not just "proposed amendments"—in reassessing futility. *Id.*

*4 On remand, Panther moved for leave to file the 2PSAC, adding the allegations that Sumitomo Electric and NEC were Ikanos's two largest customers and that they accounted for 72% of Ikanos's revenues in 2005. Panther further alleged that, weeks before the Secondary Offering—when Ikanos was receiving an increasing volume of complaints from these customers—Ikanos knew it would be unable to determine which of the chip sets it sold them contained defective chips. In November 2010, the district court denied Panther's motion, again on the grounds of futility, finding that the 2PSAC failed to allege " 'additional facts that Ikanos knew the defect rate was above average before filing the registration statement.' " Special App. at 4, 5 ("*Panther Partners IV*") (quoting *Panther Partners III,* 347 F. App'x at 622). Panther's new allegations regarding Sumitomo Electric and NEC, the district court reasoned,

> have no logical connection to the issue of when Ikanos knew that the defect rate was above average. Although these customer demographics might shed light on whether any defect might potentially be problematic *assuming the defect rate turned out to be above average,* this does not satisfy the Second Circuit's road map—it is simply a detour.

*Id.* at 4.

Panther appeals again, arguing that the district court erred by considering in isolation only those allegations in the 2PSAC that supplemented the 1PSAC and by applying the wrong standard in assessing whether the 2PSAC adequately alleged a failure to comply with Item 303. Specifically, Panther argues that the issue before the district court was not whether Ikanos knew the defect rate was "above average" before filing the Registration Statement. *Id.* at 4, 5 (quotation marks omitted). Rather, the district court should have addressed the question of whether, in failing to disclose the scope of the defect issue with which Ikanos was then grappling, defendants concealed a "known trend[ ] or uncertaint[y] ... that [Ikanos] reasonably expect[ed] w[ould] have a material ... unfavorable impact on ... revenues or income from continuing operations," 17 C.F.R. § 229.303(a)(3)(ii).

**STANDARD OF REVIEW**
[1][2][3] We review a district court's denial of leave to amend for abuse of discretion, unless the denial was based on an interpretation of law, such as futility, in which case we review the legal conclusion de novo. *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010). Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 50 (2d Cir.1991). In assessing whether the proposed complaint states a claim, we consider "the proposed amendment[s] ... along with the remainder of the complaint," *Sony BMG,* 592 F.3d at 323 n. 3, accept as true all non-conclusory factual allegations therein, and draw all reasonable inferences in plaintiff's favor to determine whether the allegations plausibly give rise to an entitlement to relief. *Iqbal,* 556 U.S. at 678–80.

**DISCUSSION**
*5 [4] Sections 11 and 12(a)(2) of the Securities Act impose liability on certain participants in a registered securities offering when the registration statement or prospectus contains material misstatements or omissions. 15 U.S.C. §§ 77k, 77l (a)(2). The provisions are "notable both for the limitations on their scope as well as the *interrorem* nature of the liability they create." *In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347, 359 (2d Cir.2010). Section 11 imposes strict liability on issuers and signatories, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))
(Cite as: 2012 WL 1889622 (C.A.2 (N.Y.)))

negligence liability on underwriters, "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability under similar circumstances for misstatements or omissions in a prospectus. See id. § 77l (a)(2). And § 15 imposes liability on individuals or entities that "control[ ] any person liable" under §§ 11 or 12. Id. § 77o. Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims which—unless they are premised on allegations of fraud—need not satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. See Morgan Stanley Info. Fund, 592 F.3d at 359; Rombach v. Chang, 355 F.3d 164, 171 (2d Cir.2004). Nor do the heightened pleading standards of the Private Securities Litigation Reform Act apply to such non-fraud claims. See 15 U.S.C. § 78u–4(b)(1)–(2). Thus, the provisions "place[ ] a relatively minimal burden on a plaintiff." Litwin, 634 F.3d at 716 (quotation marks omitted); see also id. at 715 (observing that §§ 11 and 12(a)(2) claims not premised on allegations of fraud are "ordinary notice pleading case[s], subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a)"); Morgan Stanley Info. Fund, 592 F.3d at 360 (observing that §§ 11 and 12(a)(2) "apply more narrowly but give rise to liability more readily" than § 10(b) of the Securities Exchange Act of 1934).

One of the potential bases for liability under §§ 11 and 12(a)(2) is an omission in contravention of an affirmative legal disclosure obligation. Id. In this case, Item 303 of SEC Regulation S–K provides the basis for Ikanos's alleged disclosure obligation. The Regulation, as we have seen, requires registrants to "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations." Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a) instruction 3. According to the SEC's interpretive release regarding Item 303, the Regulation imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989). We believe that, viewed in the context of Item 303's disclosure obligations, the defect rate, in a vacuum, is not what is at issue. Rather, it is the manner in which uncertainty surrounding that defect rate, generated by an increasing flow of highly negative information from key customers, might reasonably be expected to have a material impact on future revenues.

*6 Litwin v. Blackstone Group, L.P., decided after the district court denied Panther leave to file the 2PSAC, is instructive on this point. There, investors sued Blackstone, an asset management company, under §§ 11 and 12(a)(2) for omitting from a registration statement and prospectus information regarding negative trends in the real estate market. Blackstone's real estate investments accounted for approximately 22.6% of its assets under management. Reversing the district court's dismissal of the complaint, we held that plaintiffs adequately alleged that Blackstone was required by Item 303 to disclose the trend, "already known and existing at the time of the IPO," because it "was reasonably likely to have a material impact on Blackstone's financial condition." 634 F.3d at 716. In so holding, we emphasized that

> the key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect Blackstone's investments.... Again, the focus of plaintiffs' claims is the required disclosures under Item 303—plaintiffs are not seeking the disclosure of the ... downward trend in the real estate market.... Rather, plaintiffs claim that Blackstone was required to disclose the manner in which th[at] then-known trend[ ], event[ ], or uncertaint[y] might reasonably be expected to materially impact Blackstone's future revenues.

Id. at 718–19.

[5] We hold that the 2PSAC plausibly alleges that the defect issue, and its potential impact on Ikanos's

--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))
(Cite as: 2012 WL 1889622 (C.A.2 (N.Y.)))

business, constituted a known trend or uncertainty that Ikanos reasonably expected would have a material unfavorable impact on revenues or income from continuing operations. Like the 1PSAC, the 2PSAC alleges that, before the Secondary Offering, Ikanos was receiving an increasing number of calls from Sumitomo Electric and NEC alerting Ikanos to the fact that its chips were defective and were causing network failures. The 2PSAC also alleges that the "defect issues," which were becoming "more pronounced," were a "substantial problem for [Ikanos] to resolve"—so much so that members of Ikanos's Board of Directors were discussing the issue, and representatives from the Company were flying to Japan to meet with Sumitomo Electric and NEC. J.A. at 51–52. However, the 2PSAC adds the critical allegations (1) that these customers accounted for 72% of Ikanos's revenues in 2005 and (2) that Ikanos knew at the time it was receiving an increasing number of calls from these customers that it would be unable to determine which chip sets contained defective chips. The 2PSAC then articulates the plausible inference to be drawn from these facts: that Ikanos "knew that ... the chips that it had sold to ... its largest customers and the largest source of its revenues[ ] were defective, ... and that it [may] therefore have to accept returns of *all* of the chips that it had sold to these two important customers." *Id.* at 52 (emphasis added).

*7 The reasonable and plausible inferences from these allegations are not simply that Ikanos quite possibly would have to replace and write off a large volume of chip sets, but also that it had jeopardized its relationship with clients who at that time accounted for the vast majority of its revenues. It is true that, as alleged, Ikanos did not recall and undertake to replace all the chip sets until June 2006. Nor was the precise 25–30% chip failure rate determined until after the Secondary Offering. But neither of these facts undermines the plausible inference that, at a time when it was receiving an increasing number of calls from these customers and its Board of Directors was discussing the issue, Ikanos was aware of the "uncertainty" that it might have to accept returns of a substantial volume, if not all, of the chips it had delivered to its major customers. It goes without saying that such "known uncertainties" could materially impact revenues. *See Litwin,* 634 F.3d at 722.

In light of these allegations, the Registration Statement's generic cautionary language that "[h]ighly complex products such as those that [Ikanos] offer[s] frequently contain defects and bugs" was incomplete and, consequently, did not fulfill Ikanos's duty to inform the investing public of the particular, factually-based uncertainties of which it was aware in the weeks leading up to the Secondary Offering.

[6] In focusing on whether plaintiff alleged that Ikanos knew the defect rate was "above average" before the Secondary Offering, the district court construed the proposed complaint and our remand order too narrowly. *See Panther Partners III,* 347 F. App'x at 622. Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries. *See Matrixx Initiatives, Inc. v. Siracusano,* ---- U.S. ----, ---- – ----, 131 S.Ct. 1309, 1318–19, 179 L.Ed.2d 398 (2011) (explaining that the problem with "bright-line" and "categorical" rules is that they "would artificially exclude information that would otherwise be considered significant to the trading decision of a reasonable investor" (brackets and quotation marks omitted)). If nothing else, the allegations pertaining to Sumitomo Electric and NEC altered the relevant inquiry, rendering a narrow focus on defect rates inappropriate. Under the new allegations in the 2PSAC, the defect rate was, in essence, 100% for all chips sold to clients representing 72% of revenues. These circumstances were not simply "potentially problematic" for the Company; they were very bad. *Panther Partners III,* 347 F. App'x at 622. We have little difficulty concluding that Panther has adequately alleged that the disclosures concerning a problem of this magnitude were inadequate and failed to comply with Item 303.

## CONCLUSION

The judgment of the district court is vacated, and the case remanded with instructions to grant Panther leave to file the 2PSAC.

> FN* The Clerk of Court is directed to amend the official caption to read as shown above.
>
> FN1. Non-conclusory allegations, as set forth in this section, construed in the light most favorable to the plaintiff and assumed to be true, are drawn from Panther's second proposed second amended complaint ("2PSAC") and from SEC filings referenced therein. *See Ashcroft v. Iqbal,* 556 U.S. 662,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 1889622 (C.A.2 (N.Y.)))**

678–80, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 708 (2d Cir.2011); *ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

FN2. Kirkendahl voiding is caused by the mingling of alloys between a gold wire and aluminum pad, causing the connection between the components to fail over time through different temperature exposures.

C.A.2 (N.Y.),2012.
Panther Partners Inc. v. Ikanos Communications, Inc.
--- F.3d ----, 2012 WL 1889622 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.