UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

NECA-IBEW PENSION TRUST FUND          :
and DENIS MONTGOMERY, on behalf
of themselves and all others          :
similarly situated,
                                      :    10 Civ. 440 (LAK)(HBP)
                    Plaintiffs,
                                      :    OPINION AND
     -against-                             ORDER
                                      :

BANK OF AMERICA CORPORATION,
et al.,                               :

                    Defendants.       :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.   Introduction


          Plaintiffs NECA-IBEW Pension Trust Fund ("NECA-IBEW")

and Denis Montgomery commenced this putative securities class

action against the BAC Defendants[1] and the Underwriter Defen-

---

          [1] The BAC Defendants include:  Bank of America Corporation;
Banc of America Securities LLC; Kenneth D. Lewis; Joe L. Price;
Neil A. Cotty; William Barnet, III; Frank P. Bramble, Sr.; John
T. Collins; Gary L. Countryman; Tommy R. Franks; Charles K.
Gifford; W. Steven Jones; Walter E. Massey; Thomas J. May;
Patricia E. Mitchell; Thomas M. Ryan; O. Temple Sloan, Jr.;
Meredith R. Spangler; Robert L. Tillman; and Jackie M. Ward.
Plaintiffs treat Banc of America Securities LLC as an underwriter
defendant in the proposed second amended complaint (see Proposed
Second Amended Complaint for Violation of Federal Securities Laws
("Proposed SAC"), annexed as Exhibit A to Declaration of C.
Michael Plavi, II in Support of Plaintiffs' Motion for Leave to
                                              (continued...)

dants[2] on June 19, 2010.  Plaintiffs allege violations of Sec-
tions 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Secu-
rities Act") in connection with two securities offerings made in
2008.

By notice of motion dated March 15, 2012 (Docket Item
61), plaintiffs move for leave to file a second amended class
action complaint pursuant to Fed.R.Civ.P. 15.  For the reasons
set forth below, plaintiffs' motion is denied.

II.   Facts

    A.   Procedural
         History

The allegations underlying plaintiffs' claims are set
forth in detail in my Report and Recommendation dated February 9,
2012, NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., 10 Civ.
440 (LAK)(HBP), 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012),
familiarity with which is assumed.  Accordingly, I shall review
plaintiffs' allegations here in summary fashion.

---

[1](...continued)
File a Second Amended Class Action Complaint, dated Mar. 15, 2012
(Docket Item 63)("Plavi Decl."), at ¶ 45).

[2] The Underwriter Defendants include:  Citigroup Global
Markets Inc.; Deutsche Bank Securities; J.P. Morgan Securities
Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan
Stanley & Co. Incorporated; UBS Securities LLC; and Wachovia
Capital Markets, LLC.

2

Plaintiffs' claims arise out of two Bank of America Corporation ("BAC") public offerings of securities conducted in the first half of 2008:  (1) the "Series K" Offering of January 24, 2008, and (2) the "Series H" Offering securities of May 5, 2008 (Proposed SAC ¶ 1).[3]  Plaintiffs allege that, in connection with these offerings, BAC and its underwriters made various misrepresentations with respect to the value of BAC's loan portfolio and the quality of the assets of Countrywide Financial Corporation ("Countrywide"), which BAC had acquired in 2008 (Reply in Support of Plaintiffs' Motion for Leave to File a Second Amended Class Action Complaint, dated May 18, 2012 (Docket Item 71)("Pls.' Reply. Mem."), at 1).  The Honorable Lewis A. Kaplan initially referred the matter to me to issue a Report and Recommendation on defendants' motion to dismiss the plaintiffs' first amended complaint for failure to state a claim (Docket Item 23).

On February 9, 2012, I issued a Report and Recommendation, recommending that defendants' motion to dismiss be granted in its entirety.  <u>NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.</u>, <u>supra</u>, 2012 WL 3191860.  However, because

---

[3] Plaintiffs' Proposed SAC does not contain any claims concerning the "Series L" offering, also conducted on January 24, 2008, and I assume that plaintiffs have abandoned their claims(Proposed SAC ¶ 1).

plaintiffs, in addition to opposing the motion to dismiss,
requested leave to amend their complaint but failed to include
with their request a copy of the proposed amended pleading, I
denied the application to amend without prejudice to renewal by
way of formal motion.  NECA-IBEW Pension Trust Fund v. Bank of
Am. Corp., supra, 2012 WL 3191860 at *25.  On March 15, 2012,
plaintiffs moved for leave to file a second amended complaint,
and included with the motion a copy of their proposed amended
pleading (Docket Item 61).[4]

          In an Order issued March 16, 2012 (Docket Item
65)("March 16 Order"), Judge Kaplan adopted the February 9, 2012
Report and Recommendation in full, dismissing plaintiffs' first
amended complaint.  Judge Kaplan stated that

          To a very large extent, [plaintiffs' first amended
          complaint] complains of statements of belief and
          omissions, the truth or falsity of which depends upon
          what view the maker held at the time they occurred,
          e.g., the adequacy of loan loss reserves and
          pre-acquisition due diligence, the value of instruments
          not traded on efficient markets and for which valuation
          therefore was a matter of opinion, the proper amounts
          of reserves, whether Bank of America was well
          capitalized, capital and leverage ratios that depended
          upon valuation of instruments not traded on efficient
          markets, the adequacy of internal controls, and so on.
          But there is nothing in the complaint that suggests

_____

          [4] By stipulation of the parties, plaintiffs filed their
first amended complaint on June 18, 2011 (First Amended Complaint
for Violation of Federal Securities Laws, dated January 14, 2011
(Docket Item 25)).

that Bank of America did not, at the times relevant to
the issue of the truth or falsity of its statements,
actually hold the opinions and beliefs in question.

(March 16 Order at 1-2).  Regarding plaintiffs' pending motion

for leave to amend their complaint, Judge Kaplan noted that

So far as the request for leave to amend is
concerned, plaintiffs argue that they should be
afforded the opportunity, unconditionally, to file any
amended complaint they see fit in the event the motions
to dismiss are granted.  They are mistaken.  The point
in any case now is academic, as they yesterday moved
for leave to file a second amended complaint, which the
defendants are free to oppose, should they wish to do
so, on the ground that the proposed amendment would be
futile.

(March 16 Order at 2).  On that same date, Judge Kaplan referred

the matter to me to issue a decision on plaintiffs' motion for

leave to file a second amended complaint (Docket Item 64).


        B.    Plaintiffs' Proposed
              Second Amended Complaint


        Plaintiffs' proposed second amended complaint

("proposed SAC") includes numerous alterations and new factual

allegations in an attempt to rectify the deficiencies noted in my

February 9, 2012 Report and Recommendation.  The new content set

forth in the proposed SAC falls into two major categories:  (1)

new allegations concerning BAC's allegedly improper accounting of

collateralized debt obligation ("CDO")-related assets in 2007-

2008 and (2) new allegations purportedly showing that statements

5

about the Countrywide acquisition made by Defendant Kenneth
Lewis, the former CEO of BAC, were knowing falsehoods (Pls.'
Reply Mem. at 1).  In other respects, the claims raised in
plaintiffs' proposed SAC are substantially similar those raised
in the first amended complaint and addressed in my February 9,
2012 Report and Recommendation.

Plaintiffs' new accounting allegations concern actions
taken by BAC management in 2007, all of which allegedly resulted
in material misstatements in the Series K and Series H offering
documents.  Plaintiffs' principal new allegation appears to be
that beginning in mid-2007, BAC's management "remove[d] its
entire CDO portfolio and CDO-related assets from the scrutiny of
the Company's Value-at-Risk [("VAR")] statistical model and other
internal financial risk controls," thereby "mask[ing] the
Company's true CDO loss exposure to the investing public and
delay[ing] appropriate asset write downs and the taking of loss
reserves for [BAC's] CDO portfolio" (Memorandum of Law in Support
of Plaintiff's Motion for Leave to File a Second Amended Class
Action Complaint, dated Mar. 15, 2012 (Docket Item 62)("Pls.'
Mem.), at 3-4).  Plaintiffs argue that the removal of CDOs from
BAC's VAR models enabled BAC to avoid costly writedowns at the
end of 2007 and retain its status as "well capitalized" under

federal banking regulations, allowing it to conduct the Series K offering on more favorable terms (Pls.' Mem. at 4).

Plaintiffs' new allegations concerning Countrywide relate to representations made by Defendant Lewis on January 11, 2008, when BAC announced the acquisition of Countrywide.  In particular, plaintiffs continue to attack Lewis's statement that "much of [Countrywide's] originations in the current market are of much higher quality and better spreads than the past couple years." (Pls.' Mem. 5-6).  According to plaintiffs, information provided by BAC to the Financial Crisis Inquiry Commission ("FCIC"), which did not become publicly available until February 2011, combined with BAC's "extensive due diligence" prior to the acquisition, demonstrates the objective falsity of Lewis's statements and that Lewis could not have believed them when they were made (Pls.' Mem. 5-7).

Defendants argue that plaintiffs' motion for leave to amend should be denied as futile.[5]  Defendants first contend that many of plaintiffs' claims continue to be time-barred by the Securities Act's one-year statute of limitations, and that to the extent plaintiff is asserting new allegations, such allegations

---

[5] The Underwriter Defendants adopt the arguments made by the BAC Defendants (The Underwriter Defendants' Opposition to Plaintiffs' Motion for Leave to File a Second Amended Class Action Complaint, dated Apr. 20, 2012 (Docket Item 70), at 1).

are barred by the Securities Act's three-year statute of repose
(The BAC Defendants' Memorandum of Law in Opposition to
Plaintiffs' Motion for Leave to File a Second Amended Class
Action Complaint, dated Apr. 20, 2012 (Docket Item 68)("Opp'n
Mem."), at 2-3).  With respect to plaintiffs' accounting-related
allegations, defendants continue to assert that the documents
plaintiffs' cite contain no material misrepresentations, and that
many of the documents cited by plaintiff in support of their
claim contain the very information that plaintiffs allege is
concealed (Opp'n Mem. at 3-4).  Additionally, defendants argue
that statements relating to BAC's VAR models are inherently
forward-looking, were accompanied by adequate cautionary language
and, thus, are shielded by the Private Securities Litigation
Reform Act ("PSLRA")'s safe harbor provision and the "bespeaks
caution" doctrine (Opp'n Mem. at 21-23).  Finally, with respect
to plaintiffs' Countrywide-related allegations, defendants argue
that the FCIC data plaintiffs' cite, rather than undermining
Lewis's statements, confirms their accuracy (Opp'n Mem. at 12-
14).

III. <u>Analysis</u>

    A.    Standards Applicable to a
        <u>Motion to Amend the Pleadings</u>

       The standards applicable to a motion to amend a
pleading are well settled and require only brief review.  A
motion to amend is governed by Fed.R.Civ.P. 15(a), which provides
that leave to amend should be freely granted when justice so
requires.  Fed.R.Civ.P. 15(a); <u>Foman v. Davis</u>, 371 U.S. 178, 182
(1962); <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 200 (2d
Cir. 2007); <u>Aetna Cas. & Sur. Co. v. Aniero Concrete Co.</u>, 404
F.3d 566, 603 (2d Cir. 2005); <u>Dluhos v. Floating & Abandoned
Vessel, Known as "New York"</u>, 162 F.3d 63, 69 (2d Cir. 1998);
<u>Gumer v. Shearson, Hammill & Co.</u>, 516 F.2d 283, 287 (2d Cir.
1974).  "Nonetheless, the Court may deny leave if the amendment
(1) has been delayed unduly, (2) is sought for dilatory purposes
or is made in bad faith, (3) the opposing party would be
prejudiced, or (4) would be futile." <u>Kuriakose v. Fed. Home Loan
Mortg. Corp.</u>, 08 Civ. 7281 (JFK), 2012 WL 4364344 at *4 (S.D.N.Y.
Sept. 24, 2012) (Keenan, D.J.), <u>quoting</u> <u>Lee v. Regal Cruises,
Ltd.</u>, 916 F. Supp. 300, 303 (S.D.N.Y. 1996) (Kaplan, D.J.),
<u>aff'd</u>, 116 F.3d 465 (2d Cir. 1997); <u>see</u> <u>McCarthy v. Dun &
Bradstreet Corp.</u>, <u>supra</u>, 482 F.3d at 200; <u>Ellis v. Chao</u>, 336 F.3d

114, 126-27 (2d Cir. 2003); Montefiore Med. Ctr. v. Am. Prot.
Ins. Co., 00 Civ. 3235 (LTS)(MHD), 2003 WL 21108261 at *1
(S.D.N.Y. May 14, 2003) (Swain, D.J.); Am. Home Assur. Co. v.
Jacky Maeder (Hong Kong) Ltd., 969 F. Supp. 184, 187-88 (S.D.N.Y.
1997) (Kaplan, D.J.).  Because defendants oppose plaintiffs'
motion to amend solely on the ground that the proposed SAC is
futile, I limit my discussion to that issue.

A proposed amendment is futile when it fails to state a
claim.  Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir.
1990); Mina Inv. Holdings Ltd. v. Lefkowitz, 184 F.R.D. 245, 257
(S.D.N.Y. 1999) (Sweet, D.J.); Parker v. Sony Pictures Entm't,
Inc., 19 F. Supp. 2d 141, 156 (S.D.N.Y. 1998) (Kaplan, D.J.),
aff'd in pertinent part, vacated in part on other grounds sub
nom., Parker v. Columbia Pictures Indus., 204 F.3d 326 (2d Cir.
2000); Yaba v. Cadwalader, Wickersham & Taft, 931 F. Supp. 271,
274 (S.D.N.Y. 1996) (Koeltl, D.J.); Prudential Ins. Co. v. BMC
Indus., 655 F. Supp. 710, 711 (S.D.N.Y. 1987) (Sweet, D.J.); see
generally Dluhos v. Floating & Abandoned Vessel Known as "New
York", supra, 162 F.3d at 69-70.  The party opposing a motion to
amend has the burden of demonstrating that a proposed amendment
would be futile.  Staskowski v. Cnty. of Nassau, 05 Civ. 5984
(SJF)(WDW), 2007 WL 4198341 at *4 (E.D.N.Y. Nov. 21, 2007); see

10

also Lugosch v. Congel, No. 00 Civ. 784 (RFT), 2002 WL 1001003 at
*1 (N.D.N.Y. May 14, 2002).

A proposed amendment is futile "where the claim or
defense proposed to be added has no colorable merit."  Oliver v.
DeMarinis & Co., 90 Civ. 7950 (SS), 1993 WL 33421 at *2 (S.D.N.Y.
Jan. 29, 1993) (Lee, M.J.) (inner quotations omitted); see also
Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,
748 F.2d 774, 783 (2d Cir. 1984) (if the movant has "colorable
grounds for relief," justice requires that leave to amend be
granted in the absence of undue delay, bad faith, or prejudice).
The "'colorable grounds' requirement mandates that a district
court may not deny a motion for leave to amend a pleading [on
futility grounds] when said pleading is sufficient to withstand a
motion to dismiss under Federal Rule of Civil Procedure
12(b)(6)."  Children First Found. Inc. v. Martinez, No. 04 Civ.
0927 (NPM), 2007 WL 4618524 at *5 (N.D.N.Y. Dec. 27, 2007),
citing in part Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d
229, 244 (2d Cir. 2007); see also Estate of Ratcliffe v. Pradera
Realty Co., 05 Civ. 10272 (JFK), 2007 WL 3084977 at *4 (S.D.N.Y.
Oct. 19, 2007) (Keenan, D.J.); Journal Publ'g Co. v. Am. Home
Assur. Co., 771 F. Supp. 632, 635 (S.D.N.Y. 1991) (Leisure,
D.J.); Prudential Ins. Co. v. BMC Indus., Inc., supra, 655 F.
Supp. at 711.  In assessing the claimed futility of a proposed

11

amended pleading, the court must assume the truth of the factual
allegations set forth in the proposed amended pleading. Edwards
v. City of N.Y., 07-CV-5286 (CPS)(RML), 2009 WL 1910740 at *1
(E.D.N.Y. June 29, 2009); Da Cruz v. Towmasters of N.J., 217
F.R.D. 126, 128 n.1 (E.D.N.Y. 2003); Binder v. Nat'l Life of Vt.,
02 Civ. 6411 (GEL), 2003 WL 21180417 at *2 (S.D.N.Y. May 20,
2003) (Lynch, then D.J., now Cir. J.); Gabourel v. Bouchard
Transp. Co., 901 F. Supp. 142, 144 (S.D.N.Y. 1995) (Chin, then
D.J., now Cir. J.).

> The Supreme Court has established a two-step process
> for determining whether a plaintiff has pled sufficient
> facts to overcome a motion to dismiss.  A court must
> first ignore "mere conclusory statements" or legal
> conclusions, which are not entitled to the presumption
> of truth.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
> (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555
> (2007)).  Then, assuming the veracity of the remaining
> facts, "a complaint must contain sufficient factual
> matter . . . to 'state a claim [for] relief that is
> plausible on its face.'"  Id. (quoting Twombly, 550
> U.S. at 570).  A claim is plausible "when the plaintiff
> pleads factual content that allows the court to draw
> the reasonable inference that the defendant is liable
> for the misconduct alleged."  Id. (emphasis added).
> While this plausibility standard is not "akin to a
> 'probability requirement,'" it "asks for more than a
> sheer possibility that a defendant has acted
> unlawfully."  Id. (quoting Twombly, 550 U.S. at 556).
> Pleading facts that are "'merely consistent with' a
> defendant's liability" is insufficient.  Id. (quoting
> Twombly, 550 U.S. at 557).

Pungitore v. Barbera, 12-1795-CV, 2012 WL 6621437 at *2 (2d Cir.
Dec. 20, 2012); see also Virgil v. Town of Gates, 455 F. App'x

36, 37 (2d Cir. 2012); Smith v. NYCHA, 410 F. App'x 404, 405-06
(2d Cir. 2011).

        "[T]he complaint is deemed to include any written
instrument attached to it as an exhibit or any statements or
documents incorporated in it by reference.  Even where a document
is not incorporated by reference, the court may nevertheless
consider it where the complaint relies heavily upon its terms and
effect, which renders the document integral to the complaint."
Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006),
quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d
Cir. 2002).  In ruling on a motion to dismiss, the court is also
permitted to take judicial notice of certain facts.  See Bryant
v. New York State Educ. Dep't, 692 F.3d 202, 208 (2d Cir. 2012);
Hoffenberg v. Bodell, 01 Civ. 9729 (LAP), 2002 WL 31163871 at *3
(S.D.N.Y. Sept. 30, 2002) (Preska, D.J.) ("The Court also may
consider 'matters of which judicial notice may be taken.'"),
quoting Leonard T. v. Israel Discount Bank of New York, 199 F.3d
99, 107 (2d Cir. 1999).

        The Court of Appeals has repeatedly noted that the
trial court has broad discretion in ruling on a motion to amend.
See, e.g., Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000);
Local 802, Associated Musicians of Greater N.Y. v. Parker
Meridien Hotel, 145 F.3d 85, 89 (2d Cir. 1998); Guzman v. Bevona,

13

90 F.3d 641, 649 (2d Cir. 1996); see generally Grace v.
Rosenstock, 228 F.3d 40, 53-54 (2d Cir. 2000).

      B.    Timeliness of
          Plaintiffs' Claims

      Section 13 of the Securities Act provides that "[n]o
action shall be maintained to enforce any liability created under
section 11 or 12(a)(2) of this title unless brought within one
year after the discovery of the untrue statement or the omission,
or after such discovery should have been made by the exercise of
reasonable diligence." 15 U.S.C. § 77m.  Where plaintiffs lack
actual knowledge of the facts giving rise to their claim, courts
in this Circuit have interpreted Section 13 to mean that the one-
year limitation period begins to run when a plaintiff is placed
on "inquiry notice."  See Dodds v. Cigna Sec., Inc., 12 F.3d 346,
350 (2d Cir. 1993).  The Honorable Lewis A. Kaplan, United States
District Judge, has articulated the inquiry notice standard as
follows:

          Once plaintiffs are put on "inquiry notice" --
      that is, when the circumstances would suggest to an
      investor of ordinary intelligence the probability that
      a cause of action existed -- they have a duty to
      inquire.  The duty to inquire can be triggered by
      information contained in the financial press,
      mainstream media, and publicly filed documents.  Often
      referred to as "storm warnings," the "triggering
      information must relate directly to the
      misrepresentations and omissions the Plaintiffs allege

14

in their action against the defendants."  Once the duty
to inquire arises, if the investor makes an inquiry,
the court imputes knowledge of what a reasonable
investor would have discovered in the exercise of
reasonable diligence as of the date on which it would
have been discovered.  If the investor makes no
inquiry, the court imputes knowledge as of the date the
duty to inquire arose.

Freidus v. ING Groep N.V., 736 F. Supp. 2d 816, 827 (S.D.N.Y.

2010) (Kaplan, D.J.) adhered to on reconsideration, 09 Civ. 1049

(LAK), 2011 WL 4056743 (S.D.N.Y. Mar. 29, 2011).

In addition to this one-year-from-discovery limitations
period, Section 11 and 12 claims are also subject to an absolute
three-year limitations period, commonly referred to as Section
13's statute of repose.  Specifically, Section 13's second
sentence provides that claims under Section 11 or 12(a)(1) of the
Securities Act must be brought within three years of the date on
which the security was first offered to the public and that
claims under Section 12(a)(2) must be brought within three years
of the sale of the security.  15 U.S.C. § 77m.  This three-year
limitations period provides an "'absolute'" limit actions brought
under Sections 11 or 12.  In re Lehman Bros. Sec. & ERISA Litig.,
09 Civ. 1944 (LAK), 2012 WL 4866504 at *5 (S.D.N.Y. Oct. 15,
2012) (Kaplan, D.J.).

In Merck & Co. v. Reynolds, --- U.S. ---, 130 S.Ct.
1784 (2010), the Supreme Court addressed whether inquiry notice

15

was sufficient to start the limitations period applicable to claims brought under the Securities Exchange Act of 1934.  The statute at issue in Merck -- 28 U.S.C. § 1658 -- provided, in pertinent part, that private actions brought under the anti-fraud provisions of the Exchange Act had to be commenced "not later than the earlier of -- (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  The Court in Merck rejected the application of an inquiry notice standard to this statute and held that the limitations period for claims covered by the statute begins to run when a "reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'"  Merck & Co., Inc. v. Reynolds, supra, 130 S. Ct. at 1798.

        In City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc., 637 F.3d 169 (2d Cir. 2011), the Court of Appeals for the Second Circuit held that, under Merck, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc., supra, 637 F.3d at 175.  Thus, under the Merck/City of Pontiac triggering standard, a limitations period will not commence until a reasonably diligent plaintiff could have "plead [the] fact[s]" underlying the claim "with sufficient detail and

particularity to survive a 12(b)(6) motion to dismiss."  City of
Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc., supra, 637 F.3d
at 175.

          City of Pontiac left open the question of whether the
Merck standard applies to claims arising under the Securities
Act, or whether such claims are still governed by the inquiry
notice standard.  District Judges within this District are not
only split on whether Merck and City of Pontiac are applicable to
claims brought under the Securities Act, they are even split on
which view is the majority view.  Compare Pennsylvania Public
Sch. Employees' Ret. Sys. v. Bank of Am. Corp., 11 Civ. 733
(WHP), 2012 WL 2847732 at *20 (S.D.N.Y. July 11, 2012) (Pauley,
D.J.) ("The majority of courts in this district declined to apply
Merck to Section 11 claims . . . .") with In re Bear Stearns
Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 762
(S.D.N.Y. 2012) (Swain, D.J.) ("The question before the Court is
whether the Supreme Court's invalidation of the inquiry notice
standard for '34 Act claims extends to claims brought under
Sections 11 and 12(a)(2) of the '33 Act.  The Court concludes, in
accord with the majority of judges in this district, that it
does.").

          Finally, although the Second Circuit has observed that
whether adequate facts existed to place a plaintiff on notice is

17

"often inappropriate for resolution on a motion to dismiss," the court has also "stated that courts can 'readily resolve the issue' of inquiry notice as a matter of law on a motion to dismiss -- as has been done in 'a vast number of cases' in this circuit -- where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint.'" Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 412 (2d Cir. 2008), quoting Marks v. CDW Computer Ctrs., Inc., 122 F.3d 363, 367 (7th Cir. 1997) and Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005).  In making such a determination, "it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters." Staehr v. Hartford Fin. Servs. Group, Inc., supra, 547 F.3d at 425 (2d Cir. 2008).

Given the difference in the language of the two statutes of limitations, the logic of those Judges that have concluded that Merck does not extend to actions brought under the Securities Act is compelling.  Nevertheless, I conclude that even if the more permissive Merck standard is applied, the claims

18

alleged in the proposed SAC are time-barred, and, therefore, the proposed SAC is futile.[6]  Because plaintiffs' accounting allegations and Countrywide-related allegations are distinct and independent, I shall analyze them separately for statute of limitations purposes.

>     1.    Improper Accounting
>           Allegations

Plaintiffs argue that "the 'facts' publicly available to Plaintiffs for statute of limitations 'discovery' purposes [did] not reach the level cognizable under the Merck/City of Pontiac threshold until January 16, 2009, when BAC issued a press release reporting its fourth quarter and full year 2008 financial results" (Pls.' Reply Mem. at 16).  It was only then, plaintiffs argue, that "BAC acknowledged -- for the first time -- the necessity of billions of dollars in write downs and net-charge offs for problematic CDOs, MBSs, and loans and leases due [to]

---

[6] The proposed SAC also fails to contain the allegations necessary to establish timeliness.  "For Securities Act claims, a plaintiff must allege the time and circumstances of his discovery of the material misstatement or omission upon which his claim is based."  In re Direxion Shares ETF Trust, 279 F.R.D. 221, 231 (S.D.N.Y. 2012) (Forrest, D.J.), citing In re Chaus Secs. Litig., 801 F.Supp. 1257, 1265 (S.D.N.Y. 1992).  Plaintiffs provide no such allegations in the proposed SAC.  The statute of limitations arguments discussed herein are drawn from Plaintiffs' Reply in support of the present motion.

the combining of Countrywide's operations with those of BAC, and also increased provisions for future asset write downs, losses, and reserves" (Pls.' Reply Mem. at 16 n.18).  Upon examining the facts available during the relevant time period, however, I conclude that a reasonably diligent investor of ordinary intelligence would have had sufficient facts to plead a violation of the Securities Act by late 2008, and that plaintiffs' claims were time-barred by late 2009.

Plaintiffs' new allegations concerning BAC's allegedly improper removal of its CDO-related assets from its VAR models -- and the resulting ramifications of these actions -- concern conduct that is unrelated to BAC's acquisition of Countrywide, and allege misrepresentations and omissions in financial disclosures beginning in 2007, before the acquisition of Countrywide even took place.  Thus, plaintiffs' assertion that January 16, 2009 should serve as the statute of limitations start date because "[p]rior to that date, BAC had never publicly reported the results of the combined operations of Countrywide and BAC" improperly conflates, for statute of limitations purposes, plaintiffs' Countrywide-related claims with claims that relate only to BAC's earlier accounting practices (Pls.' Reply Mem. at 16).

20

Plaintiffs' proposed SAC offers several more plausible clues as to when a reasonably diligent plaintiff would have discovered the facts underlying the improper accounting claims. For example, according to the proposed SAC:

> BofA [did not] disclose the 70% write down on assets held in its CDO warehouse and sales and trading activities the Company had taken in the third quarter 2007 [] or otherwise disclose these write downs in the Bank's January 22, 2008 Form 8-K issued a scant few days before the $6 billion Series K . . . Offering[]. Instead, this highly material information, although internally known all along to BofA's senior management throughout the second half of 2007, was not publicly disclosed until <u>February 28, 2008</u>, when the Company filed its 2007 Form 10-K.

(Proposed SAC ¶ 73 (emphasis added)). Similarly, the proposed SAC alleges that "[o]n <u>February 28, 2008</u>, BofA filed its 2007 Form 10-K in which it disclosed, for the first time," that the procedures for VAR testing CDOs had been revised (Proposed SAC ¶ 94 (emphasis added)). The proposed SAC also states that BAC disclosed, in its Q1 2008 10-Q, filed May 8, 2008, that its "CDOs, structured financial products, and related MBS and derivative assets" were reinstated into its VAR models (Proposed SAC ¶ 95 n.6). Thus, according to the complaint, by mid-2008, the facts comprising the core of plaintiffs' accounting claims, that certain assets were strategically excluded from BAC's VAR models during a crucial time period, and that certain writedowns

21

were later taken, were publicly available and contained within the BAC financial disclosures plaintiffs cite.

BAC's increasingly precarious financial health during 2007-2008, as evidenced by the financial disclosures cited in the proposed SAC, would also have come to the attention of a reasonably diligent plaintiff.  As I noted it my February 9, 2012 Report and Recommendation, "BAC's public filings [] demonstrate that BAC [] provided for increasing loss reserves throughout the relevant time period -- specifically, beginning in the third quarter of 2007 and throughout the period leading up to the Series H and K offerings, implying that the risk of non-payment was increasing throughout the period."  NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., supra, 2012 WL 3191860 at *12; see also Proposed SAC ¶¶ 98-101; 105-08.  Such an ominous trend should have put plaintiffs on notice, by no later than the end of 2008, that they might have had a claim.  See LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003) ("[A] series of three charges in substantial and increasing amounts for the same purpose within four years should alert any reasonable investor that something is seriously wrong."); Freidus v. ING Groep N.V., 736 F. Supp. 2d 816, 827 (S.D.N.Y. 2010)(Kaplan, D.J.); In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 288 (S.D.N.Y. 2009) (Cote, D.J.).  During this

22

period, it was also well-known, not only amongst sophisticated investors but amongst the general public, that many of the dramatic losses suffered by banks like BAC were attributable to their subprime investments.  <u>Lighthouse Fin. Group v. Royal Bank of Scotland Group, PLC</u>, <u>supra</u>, 2012 WL 4616958 at *13 (S.D.N.Y. Sept. 28, 2012) ("Throughout late 2007 and 2008 -- when some of the largest banks in the world failed because of their exposure to securitized assets -- it was common knowledge that these large banks had over-exposed themselves to lower quality assets.").

Therefore, I conclude that by no later than late 2008, more than one year prior to the filing of plaintiffs' complaint on January 19, 2010, a reasonably diligent investor of ordinary intelligence would have had sufficient information about BAC's CDO writedowns and possible exclusion of CDO-related assets from its VAR models to adequately plead these facts in a complaint. Given the publicly available financial disclosures and the unprecedented financial turmoil in 2007-2008, plaintiffs' contention to the contrary is unconvincing.

Thus, for the reasons stated above, I conclude that plaintiffs' CDO-related claims are time-barred under Section 13's one-year statute of limitations.[7]

---

[7] Because I conclude that plaintiffs' CDO-related claims are
(continued...)

2.   Countrywide-Related
     <u>Allegations</u>

Plaintiffs argue that "the allegations regarding Lewis'
misrepresentations of the quality and spreads of Countrywide's
loan originations" are timely because "the data relating to
Countrywide's 2007 loan originations was not publicly available
until February 13, 2011 when the FCIC released the information"
(Pls.' Reply Mem. at 17).  Thus, contend plaintiffs, February 13,
2011 is the commencement date for the one-year statute of
limitations, because before that date, plaintiffs lacked
"sufficient information about that fact to adequately plead it in
a complaint" (Pls.' Reply Mem. at 17, <u>citing</u> <u>City of Pontiac Gen.</u>
<u>Employees' Ret. Sys. v. MBIA, Inc.</u>, <u>supra</u>, 637 F.3d at 175).  As
was the case with plaintiffs' improper accounting allegations
discussed above, this argument is also unavailing.

Plaintiffs' argument is belied by their pleadings.  The
assertion that the statute of limitations for claims arising from

---

[7](...continued)
time-barred under Section 13's one-year statute of limitations,
it is unnecessary to reach the issue of whether the claims are
new and are thus barred by Section 13's three-year statute of
repose, which is not subject to equitable tolling or Fed.R.Civ.P.
15(c)'s relation back provisions.  <u>See</u> <u>Footbridge Ltd. Trust v.</u>
<u>Countrywide Fin. Corp.</u>, 770 F. Supp. 2d 618, 624 (S.D.N.Y.
2011)(Castel, D.J.)("By the plain language of section 13, the
three-year statute of repose is absolute.")

Lewis's alleged misrepresentations did not commence until February 13, 2011 is difficult to comprehend, because allegations about Lewis's statements during the January 11, 2008 conference call were included in plaintiffs' first amended complaint, filed on January 18, 2011, a month <u>before</u> the FCIC data was released (First Amended Complaint for Violation of Federal Securities Laws, dated Jan. 14, 2011 (Docket Item 25), at ¶¶ 83-87).  Thus, the argument that plaintiffs could not have had "sufficient information" to bring these claims until <u>after</u> they were already raised in the first amended complaint is contradicted by plaintiffs' own conduct.  Not only could plaintiffs have asserted these claims earlier than they now claim, they did.[8]

Because plaintiffs' proposed commencement date is untenable on its face, it is again necessary to determine when a "reasonably diligent plaintiff would have discovered 'the facts constituting the violation[s].'"  <u>Merck & Co., Inc. v. Reynolds</u>, <u>supra</u>, 130 S. Ct. at 1798.  Upon examining the facts available

---

[8] Equally problematic for plaintiffs is that by arguing that they could not have had sufficient information until February 13, 2011 to adequately plead Lewis's misrepresentations, they are essentially conceding that their claims as to the Series K offering, which occurred on January 24, 2008, are barred under the three-year statute of repose, which is subject to neither equitable nor relation back tolling and would have expired on January 24, 2011.  <u>See</u> <u>Footbridge Ltd. Trust v. Countrywide Fin. Corp.</u>, <u>supra</u>, 770 F. Supp. 2d at 624.

during the relevant time period, I again conclude that by late 2008, a reasonably diligent plaintiff of ordinary intelligence would have had sufficient facts to plead a violation of the Securities Act predicated on Lewis's allegedly misleading statements.

Even if the general financial instability of BAC throughout 2007 and 2008, discussed above, was not enough to trigger the running of the statute of limitations period as to plaintiffs' Countrywide-related claims, there was ample adverse information regarding Countrywide in particular during the same time period.  First, there were many federal actions filed against Countrywide in 2007 and 2008, the complaints of which raise claims extremely similar to those raised in the proposed SAC.[9]  Countrywide-related litigation and Countrywide's lax

---

[9] See The BAC Defendants' Memorandum of Law in Support of Law in Support of Their Motion to Dismiss the First Amended Complaint for Failure to State a Claim, dated Mar. 4, 2011, at Appendix A, citing complaints from In re Countrywide Financial Corp. Sec. Litig., No. 07-cv-05295 (C.D. Cal.); Norfolk County Retirement System v. Countrywide Financial Corp., No. 07-cv-05727 (C.D. Cal. Aug. 31, 2007); Alvidres v. Countrywide Financial Corp., No. 07-civ-05810 (C.D. Cal. Sept. 6, 2007); Johnson v. Countrywide Financial Corp., No. 07-cv-05879 (C.D. Cal. Sept. 10, 2007); Oni v. Countrywide Financial Corp., No. 07-cv-06096 (C.D. Cal. Sept. 19, 2007); Thompson v. Countrywide Financial Corp., No. 07-cv-06190 (C.D. Cal. Sept. 24, 2007); Pro v. Countrywide Financial Corp., No. 07-cv-06252 (C.D. Cal. Sept. 26, 2007); New Jersey Carpenters' Pension Fund v. Mozilo, No. 378319 (L.A. Sup. Ct. Oct. 1, 2007); Arkansas Teacher Retirement System v. Mozilo, (continued...)

lending practices also received prominent press coverage during the same time period, in such publications as The New York Times and The Wall Street Journal (Declaration of Jonathan Rosenberg, Esq. in Support of the BAC Defendants' Motion to Dismiss the First Amended Complaint for Failure to State a Claim, dated Mar. 4, 2011 (Docket Item 31)("Rosenberg Decl."), Exhibits S-U).

        Plaintiffs' assertion that "given the positive affirmative representation by Lewis following BAC's due diligence, a reasonable investor would likely have concluded that Countrywide had been able to put its troubled past behind it" is also unpersuasive (Pls.' Reply Mem. at 15). "[R]eassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." LC Capital Partners, LP v. Frontier Ins.

---

        [9](...continued)
No. 07-cv-06923 (C.D. Cal. Oct. 24, 2007).

        Plaintiffs cite In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 765 n.16 (S.D.N.Y. 2012) (Swain, D.J.) for the proposition that "[p]laintiffs cannot be charged with knowledge of every suit filed against an originator." However, in that case, defendants cited only two "tangentially related" complaints that did not "receive[] wide press coverage." In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 765, 765 n.16 (S.D.N.Y. 2012). The publicly available information concerning Countrywide in 2008 was far more extensive.

Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003).  "Whether
reassuring statements justify reasonable reliance that apparent
storm warnings have dissipated will depend in large part on how
significant the company's disclosed problems are, how likely they
are of a recurring nature, and how substantial are the
'reassuring' steps announced to avoid their recurrence."  LC
Capital Partners, LP v. Frontier Ins. Group, Inc., supra, 318
F.3d at 155.  Lewis's statements were made in the context of
financial disclosures that referenced growing instability within
BAC's loan portfolios, and were proceeded by months of deepening
losses and general market turmoil (see Proposed SAC ¶¶ 63-70).
As I noted in the February 9, 2012 Report and Recommendation,
"information about Countrywide's then-existing financial state,
presumably, was also publicly available to some extent from
Countrywide's own financial disclosures to the investing public
(as it was also a corporation with publicly traded stock) as well
as from the financial press during the relevant time period."
NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., supra, 2012 WL
3191860 at *19; see, e.g. Eric Dash, Acquisition of Lender Is
Possibly in Jeopardy, N.Y. Times, May 6, 2008, at C; Serena Ng
and Cynthia Koons, Downgrades Show Storm Isn't Over, Wall St.
Journal, May 3, 2008, at B1.  Thus, even if Lewis's brief
statements were enough to allay the fears of a reasonable

investor, such comfort would have quickly dissipated amid the increasingly catastrophic financial climate of 2008, and would have certainly been gone well before January 16, 2009.

In short, by mid to late 2008, there was an abundance of publically available information, including BAC financial disclosures, well-publicized litigation involving substantially similar claims, and general market data, all of which plaintiffs could have employed to state a claim that Lewis's statements were material misrepresentations under the Securities Act.  The suggestion that it was not until January 16, 2009 that a reasonably diligent plaintiff would have discovered facts potentially undermining the veracity of Lewis's January 11, 2008 statements is hard to fathom.  Thus, as above, I conclude that by late 2008 at the latest, a reasonably diligent investor of ordinary intelligence would have discovered the facts constituting the Countrywide-related violations that plaintiffs allege.  Merck & Co., Inc. v. Reynolds, supra, 130 S. Ct. at 1798.

Thus, for all the foregoing reasons, I find that plaintiffs' claims are time-barred, and that granting plaintiffs leave to file a second amended complaint would, thus, be futile. In the interest of completeness, however, I shall also address

29

defendants' second argument that the proposed SAC fails to state a claim under the Securities Act.

> C.   Standards Applicable to
>       Sections 11, 12(a)(2), and 15
>       of the Securities Act

The standards applicable to claims arising under the Securities Act pursuant to Sections 11, 12(a)(2), and 15 were succinctly set forth by the Court of Appeals for the Second Circuit in In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358-60 (2d Cir. 2010).  Specifically, the Second Circuit stated:

> Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions.  Section 11 applies to registration statements, and [S]ection 12(a)(2) applies to prospectuses and oral communications.  15 U.S.C. §§ 77k(a), 77l(a)(2).  Section 15, in turn, creates liability for individuals or entities that "control [ ] any person liable" under [S]ection 11 or 12.  Id. § 77o.  Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under [S]ections 11 and 12.  See, e.g., SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996).

In re Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 358; see also Fait v. Regions Fin. Corp., 655 F.3d 105, 109 & n.2 (2d Cir. 2011); In re Barclays Bank PLC Sec. Litig., 09 Civ. 1989 (PAC), 2011 WL 31548 at *5 & n.15 (S.D.N.Y. Jan. 5, 2011)

(Crotty, D.J.).  "Issuers are subject to 'virtually absolute' liability under [S]ection 11, while the remaining potential defendants under [S]ections 11 and 12(a)(2) may be held liable for mere negligence."  In re Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 359, citing Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983); see also Fait v. Regions Fin. Corp., supra, 655 F.3d at 109.

Section 11 "provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties."  In re Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 358; see also Freidus v. ING Groep N.V., 736 F. Supp. 2d 816, 825 (S.D.N.Y. 2010) (Kaplan, D.J.); In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 433-34 (S.D.N.Y. 2009) (Sullivan, D.J.).  In order to state a claim under Section 11, a plaintiff must allege:  (1) the purchase of a registered security, "either directly from the issuer or in the aftermarket following the offering;" (2) that the defendant was an offering participant "sufficient to give rise to liability under [S]ection 11;"[10] and (3) that the registration statement "'contained an

---

[10] The parties statutorily enumerated in Section 11 include: (1) "every person who signed the registration statement;" (2) "every person who was a director of (or person performing similar (continued...)

untrue statement of a material fact or omitted to state a
material fact required to be stated therein or necessary to make
the statements therein not misleading.'"  In re Morgan Stanley
Info. Fund Sec. Litig., supra, 592 F.3d at 358-59, citing 15
U.S.C. § 77k(a); see also In re Fuwei Films Sec. Litig., supra,
634 F. Supp. 2d at 435.

"Whereas the reach of [S]ection 11 is expressly limited
to specific offering participants, the list of potential
defendants in a [S]ection 12(a)(2) case is governed by a judicial
interpretation . . . known as the 'statutory seller'
requirement."  In re Morgan Stanley Info. Fund Sec. Litig.,
supra, 592 F.3d at 359, citing, inter alia, Pinter v. Dahl, 486
U.S. 622, 643-47 & n.21 (1988); see also Freidus v. ING Groep
N.V., supra, 736 F. Supp. 2d at 825-26.  Thus, in order to state
a claim under Section 12(a)(2), a plaintiff must allege that:

_____

[10](...continued)
functions) . . . the issuer at the time of the filing of the part
of the registration statement with respect to which his liability
is asserted;" (3) "every person who, with his consent, is named
in the registration statement as being or about to become a
director, person performing similar functions . . . . ;" (4)
"every accountant, engineer, or appraiser, or any person whose
profession gives authority to a statement made by him, who has
with his consent been named as having prepared or certified any
part of the registration statement . . . . ;" and (5) "every
underwriter with respect to such security."  15 U.S.C. § 77k(a).

(1) the defendant is a "'statutory seller';"[11] (2) the sale occurred "'by means of a prospectus or oral communication'"; and (3) the prospectus or oral communication "'include[d] an untrue statement of material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'"  In re Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 359, citing 15 U.S.C. § 77l(a)(2); see also In re Fuwei Films Sec. Litig., supra, 634 F. Supp. 2d at 435.

Claims under Sections 11 and 12(a)(2) have "roughly parallel elements."  In re Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 359; see also Fait v. Regions Fin. Corp., supra, 655 F.3d at 109; In re Barclays Bank PLC Sec. Litig., supra, 2011 WL 31548 at *5.  Accordingly, these claims "are usually evaluated in tandem because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)."  Lin v. Interactive Brokers Grp., Inc., 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) (McMahon, D.J.);

---

[11] A "statutory seller" includes one who has "'passed title, or other interest in the security, to the buyer for value,'" or "'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'"  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010), citing in part Pinter v. Dahl, 486 U.S. 622, 642 (1988).

accord <u>In re Wachovia Equity Sec. Litig.</u>, 753 F. Supp. 2d 326,
368 (S.D.N.Y. 2011) (Sullivan, D.J.).  Thus, I shall evaluate
plaintiffs' Section 11 and 12(a)(2) claims together.[12]

_____

[12] In my February 9, 2012 Report and Recommendation, I
determined that Fed.R.Civ.P. 9(b)'s heightened pleading standard
was inapplicable to plaintiffs' claims.  <u>NECA-IBEW Pension Trust
Fund v. Bank of Am. Corp.</u>, <u>supra</u>, 2012 WL 3191860 at *6 n.9.  As
they did in the first amended complaint, plaintiffs continue
disclaim any allegations of fraud against defendants in the
proposed SAC (Proposed SAC ¶ 160).  However, in light of the new
allegations contained in plaintiffs' proposed SAC, reconsidering
the applicability of Rule 9(b) is warranted.

    Many of plaintiffs' new allegations, from their plain
language, appear to be alleging fraudulent conduct.  Among
plaintiffs' new allegations:

   •   [The] undisclosed practice of purportedly valuing
       CDOs and their related assets at [Statement of
       Financial Accounting Standards ("SFAS")] Level 2's
       "observable inputs" criteria, yet excluding these
       same assets from VAR and stress testing and,
       instead subjecting them to an asset valuation
       determination based [on] SFAS 157 Level 3's
       "management judgment or estimation," was a
       practice that continued throughout the fourth
       quarter 2007 before being discontinued in 1Q '08.
       It also was an accounting manipulation approved of
       by senior management (including the Individual
       Defendants) (SAC ¶ 86).

   •   [B]y removing the "super senior" CDOs from VAR in
       3Q '07 -- which constituted <u>all</u> of the Bank's CDOs
       and their corresponding MBSs and derivative assets
       -- BofA's senior management . . . chose to mask
       the Company's true CDO loss exposure to the
       investing public and wantonly delay appropriate
       asset write downs and the taking of loss reserves
       for BofA's CDO portfolio during the second half of
       2007 (SAC ¶ 88 (emphasis in original)).

                                    (continued...)

--------

[12](...continued)

- BofA's senior management and the Individual
  Defendants agreed to remove the Company's $26.2
  billion block of "super senior" CDOs, warehoused
  MBSs, and associated CDO-derivative assets from
  BofA's VAR model and stress testing and analytics
  . . . as a means to avoid having to publicly
  report the mark-to-market value of these products
  (SAC ¶ 95).

Although "plaintiffs must be allowed leeway to draft their
complaint in a comprehensible narrative form," City of Roseville
Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d
395, 424 (S.D.N.Y. 2011), words and phrases like "manipulation,"
"mask," "wantonly," and "agreed . . . as a means to avoid having
to publicly report" strongly suggest that plaintiff is alleging
more than mere negligence.  See Rombach v. Chang, 355 F.3d 164,
172 (2d Cir. 2004)(Securities Act claims sounded in fraud when
"the wording and imputations of the complaint are classically
associated with fraud:  that the Registration statement was
'inaccurate and misleading;' that it contained 'untrue statements
of material facts;' and that 'materially false and misleading
written statements' were issued."); In re China Valves Tech. Sec.
Litig., 11 Civ. 0796 (LAK), 2012 WL 4039852 at *9 (S.D.N.Y. Sept.
12, 2012) (Kaplan, D.J.); Lighthouse Fin. Group v. Royal Bank of
Scotland Group, PLC, supra, 2012 WL 4616958 at *4; Ladmen
Partners, Inc. v. Globalstar, Inc., 07 Civ. 0976 (LAP), 2008 WL
4449280 at *11-*13 (S.D.N.Y. Sept. 30, 2008) (Preska, D.J.).
Plaintiffs' use of the word "manipulation" in particular, is a
classic indicator of fraud.  See Wilson v. Merrill Lynch & Co.,
Inc., 671 F.3d 120, 129 (2d Cir. 2011) ("The Supreme Court
has observed that the word 'manipulative' is 'virtually a term of art
when used in connection with securities markets.'"), quoting
Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976).
Nevertheless, because I conclude that plaintiffs' claims are
insufficient even under Fed.R.Civ.P. 8's more relaxed pleading
standard, it is unnecessary to conclude whether any of
plaintiffs' claims truly sound in fraud and are governed by Rule
9(b)'s heightened pleading standard.

35

D.   Application of the
     Foregoing Principles to
     Plaintiffs' Claims

In adopting the February 9, 2012 Report and
Recommendation, Judge Kaplan noted that plaintiffs' first amended
complaint was replete with "statements of belief and omissions,
the truth or falsity of which depends upon what view the maker
held at the time they occurred," and that there was "nothing in
the complaint that suggests that Bank of America did not, at the
times relevant to the issue of the truth or falsity of its
statements, actually hold the opinions and beliefs in question"
(March 16 Order at 1-2).  In an attempt to overcome these
defects, plaintiffs' proposed SAC contains an abundance of new
allegations regarding BAC's allegedly improper accounting
practices and the quality of Countrywide's originations at the
time of its acquisition (Pls.' Reply Mem. at 1).  However,
plaintiffs proposed SAC is still insufficient in two major
respects.  First, plaintiffs are still unable to show "that any
of the statements of belief and omissions complained of, the
truth or falsity of which depended upon the beliefs of the maker
at the time they occurred, was false" (March 16 Order at 2).
Second, and perhaps more fundamentally, despite the volume of new
content in the proposed SAC, plaintiffs still fail to allege

36

sufficiently, other than in a conclusory fashion,[13] that
defendants, at the time the alleged misrepresentations were made,
"did not in fact entertain the opinions or hold the belief upon
which the claims are based" (March 16 Order at 1).  For these
reasons, the proposed SAC is still unable to withstand a motion
to dismiss under Rule 12(b)(6), and thus, leave to amend should
be denied on the ground of futility.

        a.   Allegations Relating to Asset
             Reclassifications, Writedowns,
             Charge-offs and
             Internal Financial Controls

      Plaintiffs newly added allegations assert that the
Series H and Series K offering documents were materially
misleading due to the non-disclosure of certain asset
reclassifications within BAC's loan portfolios, specifically, the
alleged removal of CDO-related assets from BAC's internal VAR
models (see Proposed SAC ¶¶ 71-97).  BAC's alleged decision to
remove CDOs from the VAR models, argue plaintiffs, resulted in
the CDOs being valued pursuant to SFAS 157 Level 3 (management
judgment and estimation) instead of SFAS Level 2 (mark-to-
market), and ultimately allowed BAC to avoid taking $4.5 billion
in additional write downs at the end of 2007 (Proposed SAC ¶¶ 10,

---

     [13] See Proposed SAC ¶¶ 97, 131.

16, 71-97).  Additionally, according to plaintiffs, "BAC's
undisclosed removal of CDOs from VAR and its other risk
management controls, and de facto treatment of CDOs as SFAS 157
Level 3 assets, also rendered the Sarbanes-Oxley Act Section 302
certifications executed by Defendants Lewis and Price and
appended to BAC's third quarter 2007 Form 10-Q false and
misleading because they did not disclose this material change in
BAC's internal controls" (Pls.'s Reply Mem. at 7-8 n.9, <u>citing</u>
Proposed SAC ¶¶ 83-97; 15 U.S.C. § 7241(a)).  If the proper
writedowns had taken place, continue plaintiffs, BAC's Federal
Deposit Insurance Company ("FDIC") rating would have been
downgraded from "well capitalized" to "adequately capitalized,"
seriously impairing BAC's ability to raise capital through the
stock offerings at issue (SAC ¶¶ 4-5, 88-89).  Plaintiffs also
now argue that BAC failed to disclose in its third quarter 2007
10-Q that it had reclassified its CDOs as "super senior" despite
the fact that the quality of the underlying assets "widely
varied" (Proposed SAC ¶ 84).  Finally, plaintiffs now contend
that there is an unexplained "vast differential valuation between
the Form 8-K issued shortly before the Series K Securities
Offering and Form 10-K issued a month later" (Proposed SAC ¶
105).  These new allegations are still inadequate to withstand a
motion to dismiss.

38

First, many of plaintiffs' characterizations of BAC's
financial disclosures are facially inaccurate.  For example,
contrary to plaintiffs' allegations, BAC disclosed that it
reclassified certain CDO assets from SFAS 157 Level 2 to SFAS 157
Level 3 in its 2007 third quarter 2007 10-Q, filed on November 9,
2007:

> During the three months ended September 30, 2007,
> certain financial instruments, including certain
> asset-backed securities issued by CDOs and portfolios
> of loans held-for-sale, were transferred from Level 2
> to Level 3 due to the lack of current observable market
> activity.  These instruments were valued using pricing
> models and discounted cash flow methodologies
> incorporating assumptions that, in management's
> judgment, reflect the assumptions a marketplace
> participant would use at September 30, 2007.

(Bank of America 10-Q, dated Nov. 9, 2007 ("BAC Nov. 9, 2007 10-
Q") at 35, annexed as Exhibit A to Declaration of B. Andrew
Bednark, Esq., in Support of the BAC Defendants' Opposition to
Plaintiffs' Motion for Leave to File a Second Amended Class
Action Complaint, dated Apr. 20, 2012 (Docket Item 69)("Bednark
Decl.")).  Moreover, BAC's January 22, 2008 8-K, filed prior to
the Series K offering, and incorporated into the registration
statement, <u>did</u> disclose the nearly $4 billion in mark-to-market
CDO writedowns that plaintiffs allege were only finally disclosed
in BAC's February 28, 2008 10-K (Bank of America 8-K, dated Jan.
22, 2008 ("BAC Jan. 22, 2008 8-K") at 30, annexed as Exhibit B to

Bednark Decl.).  There is also no discrepancy, as plaintiffs

allege, between BAC's January 22, 2008 8-K and its February 28,

2008 10-K relating to writedowns in BAC's "CDO Warehouse" and

"Sales and Trading" accounts; both disclose the same valuations

of the underlying assets (see BAC Jan. 22, 2008 8-K at 5, 30;

Bank of America 10-K, dated Feb. 28, 2008 ("BAC Feb. 28, 2008 10-

K"), at 29, 104-06, 139, annexed as Exhibit C to Bednark Decl.).

Finally, BAC's third quarter 2007 reclassification of its CDOs as

"super senior" had nothing to do with misrepresenting the quality

of the assets the CDOs contained, as plaintiffs argue.  Rather,

the "super senior" label referred to the payment priority of the

CDOs, as was clearly disclosed in BAC's third quarter 2007 10-Q

(BAC Nov. 9, 2007 10-Q at 78).  In sum, much of the information

that plaintiffs claim BAC was allegedly trying to "mask,"

including the purported deferral of writedowns and shifting of

CDO-related assets from SFAS 157 Level 2 to Level 3, was, in

fact, disclosed prior to the securities offerings at issue.

        With respect to BAC's VAR models, plaintiffs cite the

following passage from BAC's February 28, 2008 10-K, found under

the heading "Trading Risk Management," as evidence that BAC had

excluded CDOs from its risk models in late 2007:

            During the second half of 2007, CDO-related markets
            experienced significant liquidity constraints impacting
            the availability and reliability of transparent pricing

40

> resulting in the valuation of CDOs becoming more
> complex and time consuming.  Accordingly, it was not
> possible to mark these positions to market on a daily
> basis.  As a result, we recorded valuation adjustments
> in trading account profits (losses) of approximately
> $4.0 billion on certain discrete dates relating to our
> super senior CDO exposure.

(Proposed SAC ¶ 94, quoting BAC Feb. 28, 2008 10-K at 63).

However, as defendants correctly note, this passage only

indicates that CDOs were not valued on a daily basis, not that

CDOs were excluded from BAC's risk models entirely (Opp'n Mem. at

20).  In fact, despite the volume of new allegations in the

proposed SAC, plaintiffs cite no affirmative representations by

BAC in its third quarter 2007 10-Q regarding the nature and

extent to which CDOs were included within -- or excluded from --

its VAR models.  Without any such representations, there can be

no misrepresentations for Securities Act purposes.

Additionally, because plaintiffs' argument that

defendants violated Sarbanes-Oxley Act Section 302 is predicated

on the BAC's alleged material misrepresentations with respect to

its VAR models, it also fails to state a claim under the

Securities Act.  Internal controls, such as risk models, exist to

ensure that officers are regularly apprised of material

information.  See Robert Prentice, Sarbanes-Oxley: The Evidence

Regarding the Impact of Sox 404, 29 Cardozo L. Rev. 703, 706

(2007).  The deficiencies that plaintiffs allege, however, do not

relate to the putative inadequacy of BAC's internal controls in providing material information to BAC's officers, but to the actions taken by BAC's officers once they had such information, i.e., their decisions regarding classification and valuation of CDO assets.

In sum, plaintiffs' new accounting allegations fail to state a claim because they simply do not demonstrate that any statements by BAC were "both objectively false and disbelieved . . . at the time [they were] expressed." Fait v. Regions Fin. Corp., supra, 655 F.3d at 110.  As most, plaintiffs' allegations still show only that BAC overvalued illiquid assets whose valuation was highly subjective, and as a result, failed to take sufficient writedowns during the relevant time period.  "In the absence of . . . an affirmative misrepresentation, allegations of 'garden-variety mismanagement, such as managers failing to . . . adequately inform themselves' do not state a claim under federal securities laws." In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (Rakoff, D.J.).  The mere fact that writedowns stemming from the use or non-use of BAC's VAR models subsequently turned out to be insufficient does not render those figures false at the time that they were made part of BAC's public filings with the SEC, see Zirkin v. Quanta Capital Holdings Ltd., supra, 2009 WL 185940 at *10, especially because

42

the assets at issue were "not traded on the New York Stock
Exchange or some other efficient market," and are assets for
which the value is generally a matter of subjective opinion.
Fait v. Regions Fin. Corp., supra, 712 F. Supp. 2d at 122 & n.38;
see also Tsereteli v. Residential Asset Securitization Trust
2006-A8, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010) (Kaplan, D.J.);
Yu v. State St. Corp., supra, 686 F. Supp. 2d at 379; Fraternity
Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349,
361-63 (S.D.N.Y. 2007) (Kaplan, D.J.).

Therefore, for all the foregoing reasons, I conclude
that, even considering plaintiffs' new improper accounting
allegations, the proposed SAC still fail to state a claim under
the Securities Act.[14]

        b.   Allegations Relating to
             Countrywide Acquisition

The remainder of the plaintiffs new allegations focus
on alleged misrepresentations made by defendant Lewis in the
January 11, 2008 conference call, in particular, Lewis's
statement that "[t]he good news is much of the originations in

_____

        [14] Because I conclude that plaintiffs claims are
insufficient on their face, it is unnecessary to reach the issue
of whether BAC's VAR-related statements are protected by the
PSLRA's safe harbor or the "bespeaks caution" doctrine.

43

the current market are of much higher quality and better spreads
than the past couple years." (Proposed SAC ¶ 121).  In my Report
and Recommendation of February 9, 2012, I described this
statement as the only statement that was "potentially
actionable."  NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.,
supra, 2012 WL 3191860 at *20-*21.  However, I went on to
conclude that due to the "financial disclosures made by BAC
concerning its increasing market exposure and plaintiffs' own
allegations concerning the deteriorating market conditions during
the relevant time period, it is not plausible that one
generalized statement concerning Countrywide's originations as of
January 2008 would cause the offering documents to be misleading
within the meaning of the Securities Act."  NECA-IBEW Pension
Trust Fund v. Bank of Am. Corp., supra, 2012 WL 3191860 at *22.
Nevertheless, plaintiffs now allege that documents produced by
BAC to the FCIC, and not publicly released until February 2011,
demonstrate that Lewis's "higher quality" statement was
objectively false at the time it was made, and that given BAC's
pre-acquisition due diligence, it also could not have been
believed (Proposed SAC ¶¶ 121-31).  Plaintiffs' new allegations
remain insufficient to withstand a motion to dismiss.

          According to plaintiffs, the FCIC data demonstrate,
inter alia, that FICO scores and combined loan-to-value ratios

for Countrywide's originations were "substantially similar" at
the end of 2007 to the same measurements for the years 2004-2006,
and thus any representation that the quality of the originations
was improving was false (Proposed SAC ¶¶ 127-31).[15]  However, the
data cited by plaintiffs show that at the end of 2007, average
FICO scores for Countrywide originations <u>were</u> improving and
combined loan-to-value ratios were decreasing (Countrywide
Response to June 23 Request: 4(a)-(p), annexed as Exhibit A to
Proposed SAC).  Additionally, the data indicate that by the end
of 2007, Countrywide had significant reductions in Alt-A and Pay
Option originations, two of the riskiest classes of mortgages
(Countrywide Response to June 23 Request: 4(a)-(p), annexed as
Exhibit A to Proposed SAC).  Thus, the exhibits annexed to the
proposed SAC demonstrate that "Countrywide's originations as of
[early January 2008] . . . were an improvement over Countrywide's
originations of the prior years."  <u>NECA-IBEW Pension Trust Fund
v. Bank of Am. Corp.</u>, 2012 WL 3191860 at *21.

     Even if the FCIC data were otherwise, however,
plaintiffs' allegations would still be inadequate for the reasons
stated in the February 9, 2012 Report and Recommendation, namely,

---

     [15] Plaintiffs do not appear to be arguing that the FCIC data
show Countrywide originations becoming riskier or worsening in
quality; rather, they only allege that they did not improve.

that Lewis's statement was brief, generalized, and made "in the context of BAC's November 2007 financial disclosures that: (1) its provisions for credit losses had increased; (2) its net charge-offs had increased; (3) the relevant financial markets were experiencing extreme dislocations, and further, BAC predicted continuing adverse impacts on its future financial performance as a result of those dislocations; (4) it had CDO and loan exposure, including subprime exposure and (5) its allowance for loan and lease losses had increased." NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., 2012 WL 3191860 at *22.  Thus, even if the statement were false, the context in which it was disseminated neutralized its potential to be misleading and actionable under the Securities Act.

        Therefore, for all the foregoing reasons, I conclude that plaintiffs' Countrywide-related allegations still fail to state a claim under the Securities Act, and that granting leave to file a second amended complaint would thus be futile.

                    c.    Section 15
                          Claims


        Plaintiffs continue to assert claims under Section 15 of the Securities Act against all individual defendants.  Section 15 "creates liability for individuals or entities that 'control[]

any person liable' under Sections 11 or 12 [and its] . . .
success . . . relies, in part, on a plaintiff's ability to
demonstrate primary liability under [S]ections 11 and 12." <u>In re</u>
<u>Morgan Stanley Info. Fund Sec. Litig.</u>, <u>supra</u>, 592 F.3d at 358.

Because plaintiffs have still not adequately alleged
Section 11 and Section 12(a)(2) claims with respect to the Series
H and Series K offerings, their proposed SAC necessarily fails to
state a claim under Section 15 against each of the individual
defendants. <u>Lieberman v. Cambridge Partners, LLC</u>, No. Civ. A.
03-2317, 2003 WL 22999217 at *4 (E.D. Pa. Dec. 16, 2003)
(collecting cases), <u>aff'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 432 F.3d 482 (3d Cir.
2005).

IV. <u>Conclusion</u>

For all the foregoing reasons, I plaintiffs' motion for
leave to file a second amended class action complaint is denied.

Dated:  New York, New York
        February 15, 2013

                        Respectfully submitted,

                        HENRY PITMAN
                        United States Magistrate Judge

47

Copies transmitted to:

Mark L. Knutson, Esq.
Jeffrey R. Krinsk, Esq.
C. Michael Plavi, Esq.
Finkelstein & Krinsk LLP
Suite 1250
501 West Broadway
San Diego, California  92101

Jeffrey A. Klafter, Esq.
Klafter, Olsen & Lesser, LLP
Suite 350
Two International Drive
Rye Brook, New York  10573

Jonathan Rosenberg, Esq.
William J. Sushon, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, New York  10036

Jay B. Kasner, Esq.
Scott D. Musoff, Esq.
Skadden, Arps, Slate,
    Meagher & Flom LLP
42nd floor
Four Times Square
New York, New York  10036